## RUFUS VAN BIBBER v. SWIFT & COMPANY, Appellant.

### In Banc, February 18, 1921.

1. **NEGLIGENCE: Defective Appliance: Injury to Servant: Proximate Cause.** Although an appliance furnished the servant by the master may be defective, owing to the negligence of the master, yet before the servant can recover for an injury he must show that the negligence of the master in the particular complained of was the proximate cause of his injury.

2. ———: ———: ———: **Two Possible Causes: Burden of Proof.** Where the master furnishes the servant two appliances, either of which, if in good working order, could have been used so as to prevent the injury complained of, the burden of proof is upon the servant to show that both of such appliances were defective, and by reason thereof the injury was caused; and an instruction permitting plaintiff to recover upon a showing that only one of such appliances was defective is erroneous.

3. ———: ———: ———: ———: **Instruction: Infrequent Use.** Where the master furnishes the servant two appliances, either of which, if in good working order, could have been used so as to prevent the injury complained of, it is error to refuse an instruction to the effect that if one of such appliances was convenient and safe for the servant to use and would effectually have prevented the injury if used, then it was immaterial whether such servant used it frequently or infrequently in the conduct of defendant's business.

4. ———: ———: ———: **Demurrer to Evidence.** Where the master furnishes the servant with two appliances, either of which, if in good working order, could have been used so as to prevent the injury complained of, a demurrer to the evidence should be given where there is no substantial evidence that both of said appliances were not in good working order. And plaintiff's testimony on direct-examination on that matter is not such substantial evidence, where his cross-examination shows that it was a mere guess on his part or based on hearsay and that he in fact knew nothing about it.

5. ——: ——: ——: ——: **Fellow-Servant's Negligence.** Where the evidence shows that plaintiff's injury was due to the negligence of a fellow-servant in failing to make use of suitable appliances furnished by the master for the work in hand, and there is no charge in the petition and no evidence that such fellow-servant was incompetent, a demurrer to the evidence should be given.

6. ——: ——: ——: ——: **Obvious Danger: Contributory Negligence.** Where the evidence shows that the servant received the injury complained of by reason of his voluntarily incurring a danger so glaring and obvious that reasonable men could not differ in characterizing his conduct as so negligent that a prudent servant would not have been guilty thereof, it is the duty of the court to declare his conduct contributory negligence, as a matter of law, and give a demurrer to the evidence.

Appeal from Buchanan Circuit Court.—*Hon. L. A. Vories,* Judge.

REVERSED.

*Robert A. Brown* and *Richard L. Douglas* for appellants.

(1)   The peremptory instruction requested by the defendant at the close of all the testimony should have been given for the following reasons: (a) The defendant was not negligent in failing to provide a strainer in its oil pipe.   Morgan v. Mfg. Co., 120 Mo. App. 590; Baier v. Heibel, 103 Mo. App. 622; Cobb v. Cotton Oil Co., 181 S. W. 1196; Hester v. Packing Co., 84 Mo. App. 451; Clippard v. Transit Co., 202 Mo. 432; Wilks v. Railroad, 141 S. W. 910.   (b)   The defendant had provided an additional shut-off valve, described in evidence as the needle valve.   The two valves were within two inches of each other, and even if one had become clogged or defective from cinders or other substances in the oil, the other valve could have been conveniently and effectively used to shut off the flow of oil into the furnace.   The defendant had performed its full duty in thus providing against the possible defective condition of one valve, and for

that reason its demurrer to the evidence should have been sustained. Grattis v. Railroad, 153 Mo. 380; Chrismer v. Tel. Co., 194 Mo. 189; Brands v. Car Co., 213 Mo. 698; Bohn v. Railroad, 106 Mo. 429; Muirhead v. Railroad, 103 Mo. 251; Friel v. Railroad, 115 Mo. 503; Shinners v. Mullins, 136 Mo. App. 298; Conway v. Railroad, 24 Mo. App. 235.   (c) The defendant was not charged with negligence in employing an incompetent or negligent servant in the person of McVey.  If perchance one valve was leaking, as alleged by plaintiff, it was the duty of McVey to know this fact and to use the other valve.  If he failed to perform his full duty in that regard, his negligence was that of a fellow servant, for which the defendant could not be held liable.  English v. Rand Shoe Co., 145 Mo. App. 439; Kelly v. Steamboat Co., 74 Conn. 343, 50 Atl. 871; Papagello v. Hyde, 82 N. J. L. 690, 83 Atl. 951; Knapp v. Voorhees, 74 Atl. 440; Stringham v. Stewart, 111 N. E. 188, 18 N. E. 870; Steinke v. Diamond Match Co., 87 Wis. 477, 58 N. W. 842; Rogers v. Shiele, 148 Mo. App. 53; Fogarty v. Transfer Co., 180 Mo. 490.   (d) While the rule is well settled that under proper facts negligence may be established by circumstantial evidence, in such cases, however, the evidence must tend to establish the negligence charged after other causes are excluded.  Where, as here, plaintiff's evidence does no more than tend to show a possible cause, for which the defendant might be liable, and fails to exclude other causes, and leaves it in the realm of speculation whether the accident happened from the negligence charged or from some other cause, then the court should say, as a matter of law, that plaintiff has failed to sustain his burden, and should take the issue from the jury.  Smith v. Railroad, 177 Mo. App. 269; Fink v. Railroad, 161 Mo. App. 314; Rogers v. Packing Co., 180 Mo. App. 227; Gillespie v. Railroad, 144 Mo. App. 508; Trigg v. Lumber Co., 187 Mo. 227; McGrath v. Transit Co., 197 Mo. 97; Warner v. Railroad, 178 Mo. 125; Fowler v. Electric Co., 143 Mo. App. 422;

Young v. Railroad, 113 Mo. App. 636. (e) On the facts which appear from plaintiff's own testimony, the lower court erred in refusing to instruct the jury that as a matter of law plaintiff was guilty of negligence, which contributed directly to cause the injuries sustained by him. Collett v. Kuhlman, 243 Mo. 585; White v. Railroad, 250 Mo. 482; Taylor v. Railroad, 256 Mo. 216. (2) The court erred in giving, at the request of plaintiff, his instruction No. 1. Ganey v. Kansas City, 259 Mo. 663; Burrows v. Likes, 180 Mo. App. 452; Bryan v. Lamp Co., 176 Mo. App. 729; Gessner v. Ry. Co., 132 Mo. App. 586; Linn v. Bridge Co., 78 Mo. App. 118; Coffey v. Carthage, 186 Mo. 583; Crow v. Railroad, 212 Mo. 610; James v. Railroad, 107 Mo. 484; Henson v. Kansas City, 210 S. W. 17.

*Mytton & Parkinson* for respondent.

(1) Plaintiff's case, under the pleadings and the evidence, was properly submitted to the jury, and defendant's instruction in the nature of a demurrer, was properly refused. McLain v. Ry. Co., 100 Mo. App. 384; 2 Thompson on Trials, section 1663; Baldwin v. Springfield, 141 Mo. 205; Powers v. Transit Co., 202 Mo. 280; Yost v. Cement Co., 191 Mo. App. 432. (2) There was no error in plaintiff's instructions. (3) Defendant's Instruction No. 7 was properly refused. It exempted defendant from liability if the needle valve mentioned in evidence was furnished. (4) The explosion was the direct result of the negligent act of the defendant, in failing to use a strainer to prevent the clogging of the shut-off valve. The failure of McVey to discover the oil leaking into the furnace, and to use the needle valve to shut off the flow of oil, may have been a negligent act on his part, and may have concurred in causing the explosion; however, where the negligence of a master concurs with the negligence of a fellow-servant to cause an injury, the master is, and remains, liable, notwithstanding concurring negligence of the fellow-servant.

Moore v. Transit Co., 193 Mo. 418; Cole v. Transit Co., 183 Mo. 94; Mertz v. Rope Co., 174 Mo. App. 94; Dittrich v. Mfg. Co., 190 S. W. 1010.   (5) This court cannot say, as a matter of law, that the plaintiff, was guilty of negligence barring his cause of action, in not knowing that crude oil projected into a heated and unlighted furnace would explode, where the defendant contended in the trial court and introduced expert evidence to show that no such explosion could occur as a result of such conditions.   Such a position or holding is untenable—is unthinkable.

SMALL, C.—This is a suit for personal injuries alleged to have been sustained by plaintiff from an explosion in a furnace in which oil was used for fuel in defendant's fertilizer plant at St. Joseph.

The charge of negligence in the petition is, in substance, that defendant carelessly maintained a shut-off device or valve in defective condition, so that the oil could not be completely turned off from the furnace, and negligently maintained its oil pipe without a strainer therein to prevent cinders, waste and dirt and other obstructions in the oil from passing into and clogging said shut-off device or valve, and causing it to leak.   That said leaking device or valve permitted oil to flow into the heated furnace immediately after the flames had been extinguished, and thereby gas was formed, which caused an explosion, and injured plaintiff while oiling certain machinery in the performance of his duty.

The answer was a general denial.

Plaintiff's evidence tended to show:   That he was about 40 years old.   That he had been raised on a farm, and had long experience in handling and operating steam thrashers and the engines connected therewith.   For some time prior to his injury, six or eight months, he having been injured on the 17th of November, 1916, he was engaged in the work of tending, as a machinist, the carrier and dryer devices used for carrying and drying

286 Mo.—21

the manure from which the fertilizer was manufactured by the defendant. That this carrier or conveyor moved the fresh manure and emptied it into a spout in the top of the furnace through which it fell into the dryer, a portion of which projected into and through the south end of the furnace. The furnace was about five or six feet wide, ten or twelve feet long, and eight or ten feet high; it ran north and south, the long way, the front being at the north end. The furnace was heated with fuel oil, and the purpose was to dry the manure in this dryer, and after it was sufficiently dry, to convey it to another apparatus or machine, where it was further prepared for use. The plaintiff had no connection with firing or operating the furnace, but his duties were confined to the machinery, and among other things, he was required to oil it.

McVey was the night watchman, but among his duties was that of lighting and firing the furnace about an hour every morning before the time for the day's work to commence. On this occasion, in accordance with his usual custom, McVey had started the furnace, and it was burning when the plaintiff arrived to begin work, which was about half past six o'clock in the morning. In order to oil certain portions of the machinery around and connected with the carrier, the plaintiff was obliged to go on top of the furnace, but he would always require that the fire in the furnace be put out before so doing. There was a ladder on the outside, at the northwest corner of the furnace, reaching an iron runway about three feet higher than the furnace, which extended to the south end of the furnace, where the carrier, which plaintiff intended to oil, was located. Plaintiff signified his intention to McVey to go on top of the furnace to oil, and while he was standing at the ladder ready to ascend, McVey attempted to turn down the shut-off valve so as to extinguish the fire. He watched McVey turn the stem of the valve, and apparently use exertion to turn it down as far as he could. But when McVey ceased his endeav-

ors, although the fire went out, a stream of oil almost the size of a lead pencil was seen by the plaintiff to be still projecting itself some three to five inches from the end of the burner-pipe into the furnace. The plaintiff says that he also observed that the stem of the valve was not screwed down as far as it should go to completely close, because there was a portion of the bright part of it still visible, which would have been entirely hidden if it had been screwed clear down. Plaintiff says that he stood there talking to McVey and watching the oil spurt into the furnace in this manner from five to seven minutes, knowing that it was still hot, although the fire had been extinguished. McVey had also turned the steam off, which was used to atomize and spray the oil from the end of the burner-pipe into the furnace, but McVey did not turn the oil pump off, because plaintiff noticed that at every revolution of the pump the oil would spurt out into the furnace as above stated. Plaintiff said nothing to McVey about the oil leaking into the furnace, or not being completely shut off, or that the shut-off valve might be clogged up, which he knew, from previous experience, might be the case. But after watching the oil leak or spurt into the furnace from five to seven minutes, he ascended the ladder, walked over the top of the furnace on the iron walk to the south end, where he stood right over the open spout leading down into the furnace to the end of the manure dryer. Looking down this spout he saw some smoldering fire in the manure in the dryer. While at this point, endeavoring to oil the carrier, there was an explosion in the furnace, and he was lifted up into the air, grazed or struck a concrete I-beam above him, and from thence fell to the floor, some twenty-five feet away, alighting upon his feet, and sustaining the injuries complained of.

There was evidence on the part of the plaintiff that there were impurities, such as dirt and small particles of cinders in the fuel oil, and that there was originally a strainer in the oil pipe, which caught the impurities and

prevented them from getting into the valve. But this strainer was removed about a year before plaintiff's injury, because it would get so clogged up with impurities itself as to prevent the oil from running through the pipe, and the fire would go out, after which the valves got clogged up occasionally and could not be entirely closed, so that they leaked. Plaintiff himself testified that a few days before his injury, the shut-off valve was clogged up with a cinder and he, himself, helped Fred Ingersoll, the operator of the furnace, take the valve apart and clean it. Ingersoll testified for plaintiff that both valves were out of order a few days before the injury. He took both valves out and cleaned them. He found a cinder in the shut-off valve, and a particle of waste in the needle valve. Ingersoll further testified on direct-examination, as follows: "Q. Did you ever use the needle valve to shut the oil off or turn it on? A. Use it occasionally, but it was most always too hot in front to use that needle valve, if it was burning; used the valve higher up. Q. Where was this valve down here you call the needle valve with reference to the opening out of the furnace? A. Directly in front of the hole in the furnace. Q. And you say it would get so hot that— what? A. You couldn't hold your hand there long enough to shut that burner off. Q. When the fire was burning, the method you had of controlling it, was by using this burner? A. Shutting off the top burner."

The furnace wall was about eight to twelve inches thick. There was an opening in the front wall about thirty inches above the floor, eight or ten inches square. In this opening was an iron plate set about four inches back from the face of the wall. There was a hole about the center of this plate, through which the burner-pipe projected about one inch. This hole was a few inches larger than the pipe, so that oil spurting from the end of it could be seen from the outside of the furnace. The needle valve was on this pipe directly in front of this opening in the iron plate. The shut-off valve was above

the needle valve, but just how far, whether a foot or only a few inches, is left uncertain by the evidence, but it was somewhat less exposed to heat from the furnace than was the needle valve. The primary purpose of the needle valve was to regulate as exactly as possible the amount of oil to be sprayed into the furnace to effect the most complete combustion. But it could also be used to shut off the oil entirely from going into the furnace, in case the shut-off valve failed to function for any reason.

On cross-examination, this witness said: The oil was very gummy, very thick and very heavy. The strainer that was on there was good, twelve-mesh screen. They could not get any service at all. The oil would not come through. So they had to take the screen out to get oil. The shut-off valve on the oil line would shut off the oil, when it was in good condition. "Q. The other valve, the needle valve, had a needle pushed down the burner? A. Yes, sir. . . . Q. Could either turn the needle valve and shut the oil off, or the other valve? A. Yes, sir. Q. Use both of them? A. Yes, sir. Q. So, if you turned the valve in the oil line here, and there was a leakage for any reason, leaking inside of the furnace, you could turn the center valve here, needle valve, and shut it off? A. Yes, sir. Q. So there could be no leakage? A. Yes, sir. Q. In other words, that was equipped with double precaution—needle valve and the other valve? A. Yes, sir. Q. So, if the line-valve did not work, you could shut it off with the needle valve? A. Yes, sir. Q. And would not have any leakage at all, that way? A. Yes, sir. Q. You say this sometimes got hot? A. Yes, sir. Q. That was because—? A. On account of the heat coming back. Q. If a man had a glove on, he could shut it off? A. Possibly, yes, sir. Q. Put a glove on, or take a rag and shut it off any time he wanted to? A. Yes, sir. Q. Of course, all those pipes got more or less hot? A. Yes, sir. Q. Even the valve on the oil-line (shut-off valve) would get hot? A. Get warm, of course. Q. Not as hot as the other? A. Not as hot. Q. But there was no reason, if there was any necessity for turn-

ing it off, why a man could not put something on his hand and turn it off? A. He could turn it."

On re-direct examination, this witness said: Sometimes the cinders would be cleared from the valve by the pressure of the oil, without removing the valve, sometimes a tap with a stick on the valve and the pressure would force the cinder through. So that the valve would clear itelf sometimes by striking it with a stick, and sometimes without it.

C. F. Rupe testified for plaintiff: He had 13 years' experience in installing oil furnaces, headquarters at Kansas City. If there was no screen or strainer in the pipe, the valve often got clogged up from nodules of carbon in the oil. The uniform custom was to have strainers to catch the impurities and prevent them clogging the valves and making them leak. He also said, if the shut-off valve leaks, the leak could be stopped, if they shut the needle valve, "if the needle valve don't catch something to prevent it. There is the difficulty I have had to work against in the oil burning proposition. I had to devise a special needle valve, made of steel, that I could force a seat with. Ordinary brass needle valve is no good, because sand or hard substance gets under the seat and prevents the oil from being stopped. Q. Of course, if the substance is in the oil valve, it is not here in the burner; a valve, even though it is brass, will shut it off? A. If there is nothing in there to prevent it, it would. Q. So that would be a double protection in that respect, so far as shutting off the valve or the flow of the oil? A. Yes, needle valve, good working oil, you could close it up tight; it would shut. Q. Shut off the oil? A. Sure."

On his direct-examination, speaking of these valves, the plaintiff said: "There is a valve in the center (needle valve) right there but that valve is never used, that is a dead valve. It gets so hot, you touch it, and it would burn your hand . . . Now, there is a globe valve (shut-off valve) upon this pipe. I think it is about a

foot, wouldn't say for sure. They throttled this oil right
there in this one, not in the center at all  .  .  .  . This one
in the middle is the dead one  .  .  . Said they couldn't
use it, because it got too hot there, burn their hands.''
On cross-examination, on the same subject, plaintiff said
that: Oil could be shut off with the needle valve, if it
was in working shape. ''But that center (needle) valve
hadn't been in shape. Q. You said, they were so hot,
you couldn't use them? A. Yes sir, and corroded up
tight, so you couldn't close them; they had never been
closed; never used them while I worked there. Q. Did
you ever see anybody try to close them? A. Never did.
Q. Never saw anybody try to operate that valve? A.
Not that I remember of. Q. You never tried to operate
it? A. No sir, nothing to do with it  .  .  . Do you
know whether it would operate or not, of your own knowl-
edge? A. I never seen it operated; they never did op-
erate it; they operated the one about a foot from that
(shut-off valve)  .  .  . Always used that; never did
use the other.  .  .  . In other words, you never saw
anybody try to use it? And you never used it or tried to
use it? A. No, sir, had nothing to do with it at all.''
The cut-off valve is further away from the point of the
burner than the center (needle) valve  .  .  . Could not
estimate whether it is two feet, six inches, two inches,
would not say positively, for he did not know. Did not
know whether needle valve would shut off the oil. Never
took hold of it himself, and never saw anybody else take
hold of it. He had testified that it was so hot that you
could not take hold of it, because he heard Ingersoll tell
a fellow. He himself had never had a thing to do
''with that apparatus.''

Plaintiff testified that he had worked in this room
around the furnace for five or six months before the in-
jury. Plaintiff's deposition was taken by defendant be-
fore the trial. In that deposition he testified that simi-
lar explosions had occurred before he was injured, in
this furnace, but he did not know what caused them.

However, on the trial, he said that he meant that such explosion had occurred in another structure or apparatus, where the manure was pulverized. Plaintiff also said that when the machinery was all in operation considerable dust was caused by the handling and pulverizing of the dry manure, and that explosions of this dust were not of unusual occurrence. But, when the machinery was not in operation, and had not been for some time, there was not sufficient dust to explode, and he had known of no such dust explosions unless the machinery was operating. It had not been operating that morning previous to the explosion. He further testified, that he did not know there was any danger of an explosion when he watched the oil spurt into the furnace at that time.

On cross-examination plaintiff stated that, sometime after the accident, he told Waldron, the defendant's claim agent, as near as he could then remember, all the facts about the accident, but he did not tell Waldron that any oil was leaking into the furnace, or anything about the valve limiting and permitting oil to run into the furnace.

McVey testified for defendant. That he worked for defendant for about fifteen years, the last time, three years. That he was night watchman at the time plaintiff was injured. It was his duty to light the furnace about six o'clock every morning, to get it ready for the day men, who started work about an hour later. He had lighted the burners, as usual, the morning plaintiff was injured. The oil could be shut off with the needle valve, as well as the other, if one wanted to. Used it some few times in the morning lighting the fire, but not many times. In the event the shut-off valve was clogged up, the oil could be shut off with the needle valve (which witness refers to as the center valve). If the oil still leaked after the shut-off valve failed to close, it could be shut off with the center valve. Did not have good draft in the furnace the morning plaintiff was hurt. Started to turn blower on to give more draft, when Van Bibber

came in, and witness stopped and put fire out. Generally always shut off the fire when plaintiff did the oiling. Did so on this occasion. Turned the oil valve (shut-off valve) first, and then turned the steam valve off. When witness turned the oil valve off, the flow of oil was cut off entirely, as far as he could see, and he could see from where he was standing no oil going in there at all. Then he went and shut down the oil pump. When he shut the oil and steam off, the fire went out, and after he shut the pump down, the explosion occurred. Some fire came out of the furnace at the holes where the burners went in, at the time of the explosion. He did not see any anywhere else. Several explosions there before that and since then, but never hurt anything. This explosion did not do any damage to the furnace. The part of the center (needle) valve which he took hold of never became so hot that he could not use it. Not hot enough nor heat enough to burn the hands. On cross-examination, McVey testified: That he was simply night watchman, his duties consisted of watching sacks to see that they did not catch on fire. He had no experience about burning oil. Surely, he knew that if there was a leakage there, it would cause an explosion. He used the needle valve three or four times in the year and a half that he was there. He could gauge oil better with the needle valve. He used it when lighting the fire, for adjusting the oil that came out of the burner. Generally kept it wide open. Witness did not know whether the day man used it or not. "Q. You never used it to turn the oil off—you used this? A. I used it once and a while." Generally used the shut-off valve to turn the oil off. After the explosion he saw Van Bibber lying on his back twelve or fifteen feet from the furnace. Flames came out of the front of the furnace perhaps twelve or fourteen feet at the time of the explosion and shot north past the witness. "Q. You are not supposed to have any knowledge about burning oil? A. No, never had no experience before that. Q. You had no knowledge

of burning oil? A. No. Q. Or any of the dangers incident to it? A. No, I don't know as I did particular; of course, I knew there was danger. Q. Nobody ever gave you any instructions? A. Of course they gave me some instructions. Q. Did anybody tell you how to turn it off? A. Yes, they did. Q. Who? A. Charlie Ingersoll, he was the one started me.''

Defendant's evidence further tended to prove that the shut-off valve worked freely and perfectly, immediately after the explosion, and no obstruction was found therein. Also, that the strainer was removed a year before the accident, because the strainer itself, on account of the impurities in the oil, would become clogged up or stopped up and prevent any oil from passing into the furnace. This happened so often that it was not feasible for the defendant to use the strainer for the oil. But one of defendant's witnesses testified that he used the strainer in the spring before the accident, for some months, and it did not become clogged up or stop the passage of the oil, nor did the shut-off valve become interfered with by the impurities in the oil, while he thus operated the pipe-line with the strainer in it. Other witnesses, users of oil furnaces, testified that they did not use strainers in their oil pipes. But some of them said that the oil they used was filtered through water before getting into their pipes. There were also additional witnesses who testified for defendant that the needle valve was suitable, and could be used for shutting off the oil completely.

There was a conflict in the evidence on another phase of the case. The plaintiff's evidence tended to show that the floor of the furnace was solid masonry, without any opening, and it slanted downward from the front wall of the furnace, where the burner-pipe entered the furnace, so that any oil leaking into the furnace from that pipe, in case it was not entirely shut off, would run down and spread out or collect on the bottom of the furnace. Such being the case, just before plaintiff's injury, and

the fire in the furnace being out, but the walls still hot, this oil would be transformed into gas, and such gas could have been and probably was ignited and exploded by sparks from the manure dryer.

On the other hand, numerous witnesses for the defendant, including parties who said they built and remodeled the furnace, testified that there was an opening in the floor of the furnace, just on the inside of the front wall, some six inches in width, and right under the place where the oil entered the furnace, into which any oil which might leak from the end of the burner-pipe, if it did leak, as plaintiff testified, would have fallen and run out on the outside in front of the furnace, and thus never enter or get upon the floor of the furnace at all. The defendant's evidence tended to show further, that on the morning of the accident the draft in the furnace, owing to atmospheric conditions, was poor, and that under such circumstances the combustion of the oil sprayed into the furnace was not complete, so that some of it would naturally fall to the bottom of the furnace and remain or collect there unconsumed, and that after the fire was extinguished, the furnace being hot, gas would generate from this oil, which might have been exploded by coming in contact with the smoldering sparks in the manure in the dryer. That on several previous occasions similar explosions had occurred in the furnace. Also some evidence on the defendant's part that the explosion might have happened from dust arising from dry manure in the dryer itself. One of the defendant's experts testified, in effect, that if too large a quantity of oil was in the bottom of the furnace, after the fire was put out, the heat left would not be sufficient to generate gas so as to cause an explosion. The suggestion from this testimony was, that if the oil spurted into the furnace to the extent testified to by the plaintiff, there would be no explosion.

As to plaintiff's injuries. He was not burned in any way, and no bones were broken, nor were there any internal injuries of any kind. His hip was bruised, but

he sustained no injury of consequence therefrom. He testified that he alighted upon the concrete floor on his feet, with such force as to injure his feet, ankles and knees. He says that from the time of his injury, up to the time of the trial, he was never able to walk. That immediately after the injury his feet and ankles became swollen. He was at once taken in charge by defendant's surgeon, Dr. Beck, and removed to a hospital, where he remained three weeks, and was then taken to his home in St. Joseph. That he was treated by Dr. Beck and other physicians employed by the defendant, until some time in January following his accident. Plaintiff testified that he had never been able to walk without pain, even with crutches. That at home in the house he walked or crawled on his knees, using pads on his knees. On the street he used a pair of crutches, but it was only with great pain that he could walk with them. The defendant's physicians, three or four of them, who examined and treated the plaintiff, from time to time, from the date of his injury, until January following, testified: That his feet and ankles were swollen a little at first. That there never was any injury or complaint by the plaintiff of injury to his knees. That the swelling in his feet and ankles commenced to subside shortly; a few days after he was taken to the hospital, and had completely subsided in ten days after he was taken home. That they could discover no injuries to his bones or to the membranes covering the bones of his feet or legs or covering the joints of his ankles. That when they last examined him in January, 1917, his limbs and feet and ankles were apparently in normal condition, and they knew of no reason why he was not able to walk. They say that notwithstanding the plaintiff said he could not walk, and had to move around on his knees in the house, and crutches on the outside, and suffered continually from pains, they could discover no cause for it.

Dr. Dandurrant, the only physician, other than the defendant's physicians, who examined or treated plain-

tiff, was sent there by plaintiff's counsel. He first saw plaintiff in January, 1917. At that time, Dr. Dandurrant says, plaintiff's knees were not swollen, but that his feet and ankles were swollen some. That from his examination, the covering of the bones of the feet and ankle and knee joints was probably somewhat injured. That plaintiff said that he suffered pain in those joints. That he could not say that plaintiff would ever be able to walk. That in October, 1917, he saw the plaintiff again at his home in Ellswood, Kansas, and that then plaintiff's knees were somewhat swollen, and the condition of his knees and ankles was worse than it was in January. But he further testified that he had not examined him since his visit to his home in Kansas in October, 1917. That there was no indication of a permanent disability to the knees. That walking on the knees would have a tendency to make them sore unless knee-pads were used.

The experts for defendant testified that an examination, at the time of the trial, would show whether the covering of his bones or joints was injured as indicated by Dr. Dandurrant, at the time of his examination. But it does not appear that either party asked the court to appoint a surgeon to examine him and report on the plaintiff's condition. The trial commenced on the 20th of November.

The court gave certain instructions for plaintiff, and refused certain instructions asked by defendant; also, refused defendant's demurrer to the evidence, which will be noticed in the opinion.

The jury rendered a verdict for plaintiff for $40,000, which the court reduced to $25,000, and rendered judgment for that sum against defendant.

Defendant's motion for new trial being denied, it appealed to this court.

I. The mere fact there is a negligent defect in an appliance furnished the servant by the master,
Proximate Cause. does not make the master liable for the servant's injury; such defect must be the proximate or legal cause of the injury.

In Warner v. St. L. & M. R. Railway Co., 178 Mo. l. c. 133-134, the court said:

"It is not enough to show an accident and an injury. A causal connection must be established between the accident and the negligence charged, in order to make out a case for the jury. Failing in this, as this plaintiff did, the court should take the case from the jury . . . for the reason that it would have no foundation in law or in fact to rest upon. [Holman v. Railroad, 62 Mo. 562; Sorenson v. Paper Co., 56 Wis. 338.]

"In other words, the mere occurrence of negligence and injury does not make the defendant liable. There must be a direct connection between the negligent act and the injury, and the negligence must be the proximate cause of the injury. [Reed v. Railroad, 50 Mo. App. 504; Stepp v. Railroad, 85 Mo. 229; Moberly v. Railroad, 17 Mo. App. 518; Stoneman v. Railroad, 58 Mo. 503; Harlan v. Railroad, 65 Mo. 22; Nolan v. Shickle, 69 Mo. 336, 3 Mo. App. 300; Settle v. Railroad, 127 Mo. 336; Kennayde v. Railroad, 45 Mo. 255; Stanley v. Railroad, 114 Mo. 606.]"

In this case, the absence of the strainer may have been negligence and permitted impurities to remain in the oil, which its use would have removed, but, unless such impurities obstructed and prevented the devices furnished by the master for the purpose, from shutting off the oil, the absence of the strainer and consequent impurities in the oil would have been harmless. If perfectly pure oil had leaked into the furnace, under the conditions shown in evidence, the explosion would have followed just the same. If the impurities did not prevent the effective use of the shutoff devices furnished by the defendant to shut off the oil, such impurities were not the proximate or legal cause of plaintiff's injury.

II.   The master is not an insurer of the servant against injury while in the performance of his duties as such servant. The master is only required to exercise

**Two Appliances: Burden of Proof.** reasonable care to furnish the servant a reasonably safe place to work and reasonably safe appliances. [Brands v. St. Louis Car Co., 213 Mo. 1. c. 707-8; Grattis v. Railroad, 153 Mo. 1. c. 404; Tabler v. Railroad, 93 Mo. 79; Johnson v. National Newspaper Assn., 183 S. W. 1113; Franklin v. Railroad, 97 Mo. App. 473; Glasscock v. D. G. Co., 106 Mo. App. 657; McGinnis v. Press Brick Co., 261 Mo. 287.]

If the master furnishes an appliance with two safety devices, that is, a doubly secure appliance, so that if one of such devices is out of order, the other may be used to do the master's work safely, we hold that such appliance is reasonably safe, although one of the devices is defective, provided the other is in working condition. There was abundant evidence in this case, given by both plaintiff's and defendant's witnesses, which tended to show that either the regular shut-off valve, or in case it was out of order, the needle valve, was suitable and could be used to shut off the oil unless it, too, was out of condition. So that, the appliance for shutting off the oil and preventing it from leaking into the furnace furnished by defendant was reasonably safe, unless both the regular shut-off valve and the needle valve were out of condition. The burden of proof was upon the plaintiff to show that such appliance was not reasonably safe, before defendant could be held liable for plaintiff's injury. This could only be done by showing that both valves were clogged by the impurities left in the oil by reason of the absence of the strainer, or for some other reason could not be used to shut off the oil.

The plaintiff's instruction number 1, given by the court, predicated the liability of the defendant alone upon proof of the absence of a strainer and the clogging of the shut-off valve thereby, regardless of whether the needle valve was clogged or not, or could have been used to shut off the oil and prevent the plaintiff's injury. In this there was error. Said instruction should have re-

quired the jury to find that both valves were out of
condition and could not have been used with due care to
shut off the oil, before any liability would attach to the
defendant. For the same reason defendant's instruction
number 5 should have been given. It told the jury that
if the needle valve could have been conveniently and safe-
ly used without injury to defendant's servants using the
same to shut off the oil, the verdict should have been for
defendant. This error of the court was not cured by
the giving of other instructions for the defendant to the
effect that, if McVey negligently failed to use the needle
valve, the plaintiff could not recover. It was negligent
on McVey's part not to use it, if it could have been used
as predicated in said instruction number 5.

III. The court also erred, in refusing instruction
number 7 asked by defendant, which told the jury, that
if said needle valve was convenient and safe for defend-
ant's employees to use, and that it would ef-
fectually shut off the flow of oil in the furnace,
Infrequent
Use.
then it was wholly immaterial, whether de-
fendant's employees used said valve frequently or in-
frequently in the conduct of defendant's business. This
instruction was correct. Whether said valve was used
frequently or not for shutting off the oil was immaterial;
the material question was, whether it could have been
used so at the time of plaintiff's injury. This should
have been made plain and clear to the jury.

IV. But we hold that defendant's demurrer to the
evidence should have been given. We have just ruled
that the appliance for shutting off the oil was reasonably
safe and there was no actionable negligence on the part
of the defendant, unless both valves were
clogged, or could not be used for shutting off
Demurrer to
Evidence.
the oil. We have also ruled that the burden
of proving the delinquency of both valves was upon the
plaintiff. The undisputed evidence of both plaintiff and
defendant shows the existence of both valves, and that

the oil could be shut off with either, if in working con-
dition. If, therefore, there was no substantial evidence
offered by either party, that the needle valve could not
have been used, plaintiff has failed to prove one of the
necessary facts to sustain his case. There was no such
evidence on the part of the defendant. But learned
counsel for respondent strenuously argue that there was
such evidence on the part of the plaintiff, and, there-
fore, it was for the jury. We have set out the evidence
on this subject fully in our statement of the case. We
do not regard the testimony of the plaintiff himself as
of any probative value, on this point, because, whatever
he said in his direct-examination touching the matter,
was shown by his cross-examination either to be a mere
guess on his part, or based on hearsay, and that he, in
fact, knew nothing about it. Under such circumstances,
his evidence on this point is not entitled to be regarded
as of substantial force. [Oglesby v. Railroad, 177 Mo.
l. c. 296.]

Plaintiff's witness, Ingersoll, expressly stated that
he used the needle valve occasionally to shut off the oil,
and that it could be used for that purpose, if the shut-
off valve failed to work. That by reason of these two
valves, there was a double precaution against leakage.
That if one was out of condition, the other could be used
to shut off the oil from the furnace. That while the
needle valve was usually too hot to handle with bare
hands—hotter than the shut-off valve—when the fire in
the furnace was burning, yet, even then, in case of neces-
sity (which, according to plaintiff, existed here), some-
thing could be put on the hands, such as rags, with which
the needle valve could be handled. There is no evidence
that on this occasion, when, after the fire in the furnace
had been put out, and there arose a necessity for using
the needle valve, it was too hot to handle with ordinary
care or intelligence on the part of the operator (which
would involve the use of an old rag or waste or other
equivalent protection for the hands, if necessary), or

that the needle valve was in any manner clogged up or defective, so that it could not have been used to completely shut off the oil. Plaintiff, therefore, failed to make out a case.

V. The same result is reached from another point of view. McVey and the plaintiff were fellow-servants. They worked at the same place under the observance of each other and are clearly within the rule making them fellow-servants. [Card v. Eddy, 129 Mo. 510; McCarty v. Hotel Co., 144 Mo. 397; Grattis v. Railway, 153 Mo. 380; Jackson v. Mining Co., 106 Mo. App. 441.]

*Negligence of Fellow-Servant: Demurrer to Evidence.*

If the appliance furnished could with due care on McVey's part have been used to shut off the oil, it was reasonably safe (Grattis v. Railroad, 153 Mo. l. c. 404), and plaintiff's injury was the result of his fellow-servant's negligence. Plaintiff says that McVey was right there talking with him from five to seven minutes, and allowed the oil to spurt unhindered into the hot furnace from the clogged-up shut-off valve. Plaintiff's evidence also shows that often times, when the shut-off valve was so clogged, it could be cleared by simply striking it with a stick, which McVey made no effort to do. It was McVey's duty to either clear the shut-off valve, if it was leaking, as stated by the plaintiff, if it could be done thus easily, or shut off the oil by using, or at least attempting to use, the needle valve, which was suitable for use in just such emergencies. McVey did nothing of the kind. While it is true that McVey was a night watchman, he was also in charge of operating the furnace for about an hour each morning and getting it heated up and ready for the day men, who came to work at seven o'clock. He had been so employed for sometime, as shown by the plaintiff's evidence. He presumably was competent to discharge the duties incumbent upon him. There is no charge in the petition, and no evidence, that he was incompetent.

A standard author, Labatt, says, in his work on Master & Servant (2 Ed.), vol. IV, section 1533: "It is well settled that, where the master has provided an adequate and readily accessible stock of suitable appliances in good condition, from which to make a selection, and the imperfection of an instrumentality selected therefrom was, or ought to have been apparent to the servant who selected it, the master cannot be held responsible for injuries which are sustained by the use of that instrumentality, whether the sufferer be the servant himself, who made the selection, or a co-employee." Many authorities in support of the text are cited by the learned author, among them, Forbes v. Dunnavant, 198 Mo. 193, where this court held, Lamm, J., delivering the opinion, that where the master furnished the lumber with which to build a scaffold, although some of it was defective, yet, there being sufficient good lumber, the use of defective lumber in building the scaffold would not be attributed to the master as negligence, where one of the servants, who helped build the scaffold, was afterwards injured by the breaking of a defective board therein, selected by a fellow-servant.

And Section 1534, same volume of Labatt, supported by many authorities, is as follows: "Another kind of dereliction of duty, which is regarded as characteristic of a servant, and not of the master, is that which consists of the failure of a fellow-servant to make use of suitable appliances furnished by the master for the work in hand." We regard the above doctrine as sound law and applicable to this case.

VI.  There is another reason why we think defendant's demurrer to the evidence should have been allowed. While it is true, a servant is not chargeable with contributory negligence, as a matter of law, unless the danger he encounters is glaring and obvious, yet, if it is so glaring and obvious, that reasonable men could not differ in their characterization of his conduct as so negligent that a prudent

Contributory
Negligence.

servant would not have been guilty thereof, it is the duty of the court to declare his conduct contributory negligence, as a matter of law. A machinist of plaintiff's age and experience in the operation of such dangerous machinery as steam thrashing machines and engines, and his five or six months' experience around this furnace and fertilizer machinery, where he admits explosions, even from dust, were not unusual, must be chargeable with knowing that an explosion was very likely to occur from oil leaking into and upon the hot bricks of such furnace from which the fire had just been extinguished, and which he knew was connected with a manure dryer, where there was a smoldering fire. To watch the oil leaking into such a hot furnace, for from five to seven minutes, without protesting to any one, and then calmly to ascend to the top of the furnace and stay there after seeing the live fire in the dryer, was nothing short of courting death, and taking his life in his hands. His conduct, according to his own narrative of the events leading up to the explosion, was glaringly and obviously the grossest of negligence, and bars his recovery. It was very like pouring coal oil onto smoldering ashes to start a fire in the stove. It is true, plaintiff says he did not know it was dangerous, but he is chargeable with such knowledge of his dangerous surroundings, as an adult of his experience and of ordinary intelligence would know.

In McGinnis v. Press Brick Co., 261 Mo. l. c. 298, this court made the following pronouncement, as the law in this State:

"Negligence and likewise contributory negligence, may and oftentimes does consist as well in failing to know as in failing to do. For says Labatt: 'The judicial theory of imputed knowledge, which is applied in actions by a servant against his employer, is simply this: that he is or is not chargeable with a comprehension of the conditions which caused his injury and of the risks created by those conditions, according as it may reason-

ably be inferred that those conditions or those risks would or would not have been comprehended by a person of ordinary prudence, whose mental and physical capacities, both natural and acquired, and opportunities for observing the facts indicative of danger, were the same as those of the servant himself.' [4 Labatt's M. & S. sec. 1310; Porter v. Hannibal & St. Joe Railroad Co., 71 Mo. 1. c. 77; Hollenbeck v. Railroad, 141 Mo. 97; Nicholds v. Plate Glass Co., 126 Mo. 1. c. 64.]''

Commenting upon the entire trend and scope of the hundreds of cases cited by him on this point, the above distinguished author says:

''It will be seen that the general effect of these cases is that an adult servant of ordinary intelligence is presumed to have been capable of ascertaining every fact which could have been apprehended by the senses of a person having the same opportunities as he had for exercising those senses in relation to the dangerous conditions which caused the injury.'' [4 Labatt's Master and Servant, sec. 1313, and numerous cases cited.]

We therefore hold, that plaintiff was guilty of such contributory negligence, as a matter of law, as bars his recovery.

The judgment of the circuit court is reversed. *Brown, C.,* concurs; *Ragland, C.,* not sitting.

PER CURIAM:—The foregoing opinion of SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *J. T. Blair, J.,* who dissents.