**Richard W. GILPIN and Brenda G. Gilpin, Appellants,**

**v.**

**Raymond O. PITMAN and Raymond F. Pitman, d/b/a Pitman Manufacturing Company, and the Gas Service Company, and A. B. Chance Company, Respondents.**

**No. KCD 28602.**

Missouri Court of Appeals, Kansas City District.

Dec. 27, 1978.

Motion for Rehearing and/or Transfer Denied Jan. 31, 1979.

Application to Transfer Denied March 13, 1979.

**74**

Walter R. Simpson, Robert Ernest Gould, Kansas City, for appellants; Sheridan, Sanders, Mason & Simpson, Kansas City, of counsel.

Douglas Stripp, James F. Duncan, Kansas City, for respondent The Gas Service Co.; Watson, Ess, Marshall & Enggas, Kansas City, of counsel.

Before PRITCHARD, P. J., SWOFFORD, C. J., and DIXON, J.

SWOFFORD, Chief Judge.

Appellant, Richard W. Gilpin, (hereafter plaintiff), a hydraulic mechanic, employed by L. A. Moore Company, was injured on April 21, 1971 while making repairs on a Pitman Hydraulic Crane (Hydra-Lift) owned by the respondent, Gas Service Company, (hereafter defendant), when the crane boom fell, crushing his right arm, which after several unsuccessful repair operations was amputated below the elbow. The plaintiff and his wife, Brenda, brought this action originally against defendant Gas Service Company, the owner; the partners in the Pitman Manufacturing Company, the manufacturer; and A. B. Chance Company, the distributor of the Hydra-Lift. They voluntarily dismissed their case against Pitman before trial; the trial court sustained the Chance Company's motion for a directed verdict at the close of plaintiffs' evidence; and, the trial jury brought in a verdict for defendant Gas Service. The plaintiffs' motion for a new trial as to Gas Service was overruled, and plaintiffs timely appealed. No appeal was taken as to the court's action directing a verdict for the Chance Company.

The plaintiffs submitted their case against the defendant, The Gas Service Company, upon the theory that the Hydra-Lift was equipped with a hydraulic hose, of improper length, attached to the base of the lifting cylinder and to the top of the holding valve, and that the excess length had been placed down through the turret of the equipment and thereby created a dangerous condition to persons repairing such equipment; that defendant knew, or by using ordinary care could have known, of this dangerous condition; that Richard Gilpin did not know, and by suing ordinary care could not have known, of the dangerous condition; that defendant failed to warn plaintiff or his employer of the dangerous condition; that defendant was thereby negligent; and, that plaintiff, as a direct result of such dangerous condition, was injured and damaged.

Plaintiffs raise five points on this appeal. Point V asserts error because the court gave defendant's Instructions No. 3 and No. 5, two converse instructions. Plaintiffs made no objection to these instructions in the court below at the time of trial nor was this alleged error raised in the motion for a new trial, so nothing was preserved for review on that point, and it will not be ruled. Rule 70.02 and Rule 78.07; *Price v. Ford Motor Credit Co.,* 530 S.W.2d 249, 253[1] (Mo.App.1975); *Kelso v. C. B. K. Agronomics, Inc.,* 510 S.W.2d 709, 724[13] (Mo.App.1974).

The plaintiffs' first four points are directed to Instruction No. 6, given at the request of the defendant, covering plaintiff Richard W. Gilpin's contributory negligence. This instruction is as follows:

#### "INSTRUCTION NO. 6

Your verdicts must be for the defendant, whether or not defendant was negligent, if you believe:

First, plaintiff Richard W. Gilpin either:

failed to suspend or support the hydraulic boom, prior to working on the hydraulic lines associated with the boom lifting cylinder, *or* disconnected a hydraulic line on the boom lifting cylinder holding valve without determining where the other end of the hydraulic line was connected, *or* put his arm underneath the boom when hydraulic fluid was squirting under pressure from the hydraulic line which he had just disconnected; and

Second, plaintiff Richard W. Gilpin's conduct, in any one or more of the respects submitted in paragraph First, was negligent; and

Third, such negligence of plaintiff Richard W. Gilpin caused or directly contributed to cause any damage plaintiffs may have sustained.

MAI 32.01 Modified By the Defendant" (Emphasis supplied)

Plaintiffs' Point I urges that there was no competent and substantial evidence that he "put his arm underneath the boom when hydraulic fluid was squirting under pressure from the hydraulic line" as required by the third disjunctive submission in Instruction No. 6. A similar attack is leveled at the first disjunctive submission, that he negligently failed to support the boom (Point II). In his Point III, plaintiff asserts error because the charge of negligence against him in the second disjunctive submission, that he disconnected the hydraulic line on the boom lifting cylinder without determining where the other hydraulic line was connected, fails to sufficiently hypothesize facts necessary to premise a finding of contributory negligence and in effect was a directed verdict against him.

Plaintiffs' Point IV charges that Instruction No. 6 was an unauthorized deviation from MAI 32.01 in violation of Rule 71.01(b) (sic) in that the word "directly" was omitted before the word "caused" in paragraph Third of the instruction. No such objection was raised at the trial or in plaintiffs' motion for a new trial, and therefore, plaintiffs' Point IV was not preserved for review and will not be here considered.

Since the defendant, while stoutly arguing that Instruction No. 6 was proper and supported by the evidence, further takes the position that any error in Instruction No. 6, if any, was rendered harmless because the evidence failed to establish a cause of action based upon negligence against the defendant. These appellate positions of the parties require a rather complete summary of the evidence, some of which is highly technical and in some instances somewhat obscure. Of course, if the evidence did not establish that plaintiffs made a submissible case, the matter ends there, regardless of error in Instruction No. 6.

In viewing this initial problem, the Court is bound by the long-established rule that the evidence must be viewed in the light most favorable to the plaintiffs and they are given benefit of every reasonable inference to be derived therefrom, and the defendant's evidence is disregarded unless it aids the plaintiffs. *Houghton v. Atchison, T. & S. F. R. Co.,* 446 S.W.2d 406, 408[1]

(Mo. banc 1969); *Wardenburg v. White,* 518 S.W.2d 152, 154[1] (Mo.App.1974).

When so considered, the evidence supports and a jury could find the following facts:

The equipment involved is a Pitman Hydraulic Crane known as a "Hydra-Lift" and designated by the defendant by its equipment No. 927. Basically, it can be described as a boom mounted on a flat truck bed and used for lifting and moving heavy objects. It operates by use of hydraulic fluid exerting or releasing pressure into or from several internal cylinders upon the same principle as a motor car is raised or lowered in a service station by hydraulic lifts. The source of power is the truck engine and the boom is controlled by a series of levers located on either side and at the rear of the truck cab and the boom can be raised, lowered, extended and moved from side to side as necessity demands. The specific parts of this equipment, of significance here, are:

1. The boom, and its inner extension mechanism, with a total weight of approximately 1000 pounds. It is anchored in a device known as the turret, which can swivel (and thus move the boom from side to side) located directly back of the truck cab.

2. The turret is fixed to a "tower" directly under it.

3. Directly beneath and parallel to the boom and affixed to it is a hydraulic cylinder called a "lifting cylinder", the purpose of which is to raise and lower the boom.

4. Affixed to the side of the lifting cylinder is an appliance called the "holding" (or safety) valve which has three hose connections or fluid conduits, one of which ordinarily connects to the end of the lifting cylinder, and the purpose of which is to hold the pressure in the lifting valve when the boom is raised or carrying a load even though the hydraulic system is for some reason not functional, such as a failure of the truck motor or the absence of hydraulic fluid in other parts of the system. This line is referred to in the record as the "critical" line. It is calculated to hold the boom in position and prevent it from falling in the event of sudden loss of pressure. As originally manufactured and usually maintained, the "holding" line is made of metal tubing, is about one foot to eighteen inches long, and runs from the holding valve to the end of the lifting cylinder and is either visible to a worker standing on the truck bed on that side of the boom or can be traced by hand over its length. If properly installed, no part of this line extends down into the tower beneath the turret.

5. The control valve or panel which is located beneath the turret, tower and truck bed, to which is attached several hydraulic lines or tubes from various parts of the equipment, but not the holding or "critical" line. The flow of hydraulic fluid into the various cylinders of the equipment is through this valve and is controlled in ordinary use by the levers beside the truck cab.

The lines that run to the control beneath the truck reach it from an opening about the size of a saucer located in the top of the tower directly under the turret. The plaintiff estimated the number of such lines to be five, and another hydraulic mechanic placed the number at eight. Of course, these lines were not visible to a man working from the truck bed beyond the point where they passed under the turret and into the tower.

The Hydra-Lift unit upon which the plaintiff was working when he was injured on April 21, 1971 was owned by the defendant and was purchased by it, together with the flat bed Ford Truck on which it was then mounted, on January 17, 1964. Both the Hydra-Lift and the truck were used equipment when purchased by the defendant. The type of holding valve that was on the unit when plaintiff was injured was manufactured by the Racine Valve Company in 1964 and the Hydra-Lift was manufactured by Pitman in 1962, so the holding

valve involved could not have been installed by Pitman when the lift was manufactured. No evidence appears in the record as to who added the holding valve, how or when it was added to the equipment, or whether it was part of the equipment when it was purchased by the defendant in 1964, but it was stipulated that it had been a part of the equipment since May 26, 1970, or eleven months prior to the date of plaintiff's injury. At the time Pitman manufactured the Hydra-Lift in 1962, the holding valves as well as boom rests (to hold the boom up without the use of hydraulic pressure) were optional equipment and were not routinely included in the manufacture of the lift, and the unit here involved was not equipped with either when purchased by the defendant and had no boom rest on the date of the injury.

The Ford truck originally purchased with the Hydra-Lift by the defendant in 1964 wore out, and in May of 1970 the defendant had the Hydra-Lift reconditioned and transferred to a 2-ton Chevrolet truck by National Truck Company. From that time until the date of the plaintiff's injury, no one but hydraulic and other mechanics, regular employees of the defendant, worked upon or made inspections of the hydraulic system. These employees had installed a universal hydraulic hose on the unit on November 5, 1970, five months before plaintiff's injury, but the defendant's records do not show where it was installed.

On the date of plaintiff's injury, the defendant delivered this equipment to plaintiff's employer, L. A. Moore Company, for repairs, with the following instructions: "Replace all hoses showing wear; check unit for leaks and repair; and, check over and make repairs as needed". This equipment was taken to the Moore place by an employee of the defendant, Ira F. Teeter, a machine operator. He was instructed to wait for the repairs to be made since the defendant wanted the equipment back in service as soon as possible and the Moore people were so advised. The plaintiff was assigned this work and told to get it done as soon as he could. When he commenced this work, all of the connections on the holding valve were made of rubber hose. After the collapse of the boom and plaintiff's injury, it was found that the hydraulic line upon which plaintiff had been working was, in fact, the "critical" line for holding the boom and ran from the top of the holding box to the back of the lifting cylinder, was approximately three feet in length, instead of one foot; that the excess length had been placed or "stuffed" under the turret into the opening to the control box below the truck bed and that this situation could not be seen or otherwise discovered by a workman in the position in which plaintiff was before the injury.

The record showed that the proper length for such "critical" line, in order to accomplish its intended purpose, was one foot; that Pitman, the manufacturer, would always install this line of steel or metal tubing, and the three-foot rubber line of rubber tubing was not a proper installation. No warning was given to the plaintiff or to any other employee or official of the Moore Company in regard to the improper installation of the holding line.

Another employee of L. A. Moore Company was assisting the plaintiff in the work on the truck. This person was only employed by Moore for a short period and at the time of the trial his whereabouts were unknown and his testimony was unavailable. He was not further identified.

The plaintiff testified that he told this man to get under the truck at the control box and to shake the lifting cylinder hose so that he, the plaintiff, could identify such hose by the movement of a line at the hold valve. The lifting cylinder hose (and all hoses at the control box leading up through the tower and turret) could be safely removed without any affect upon the hydraulic holding function of the equipment. The fellow employee went below to the control box and a hose on top moved and it was the connection to the hold box of this hose that the plaintiff then removed. The plaintiff was left-handed and in order to disconnect this line, he held his wrench in his left hand and held the hose line in his right hand. In

that position, a portion of his right arm was on the side of the turret beneath the boom. At that time, the boom was in a raised position approximately parallel with the truck bed and was unsupported except for the hydraulic pressure in the holding cylinder and line. When plaintiff disconnected the line from the holding box, oil commenced to spurt out into his face, the boom fell upon his right arm on the turret, and he was injured. He did not grab for anything or make any sudden movement with his right arm. He had, in fact, removed the holding or "critical" line and thus released the hydraulic fluid and pressure holding the boom. He had no realization of this or that the boom would fall until it happened, but had identified the line as the lifting cylinder hose by reason of its movement when the man at the control box beneath the truck was instructed to move that line. The cylinder lifting hose could have been safely removed without the boom falling. The evidence showed that the method of line identification so employed was common practice and custom in the industry when the man on the top side could not identify a line by visual or manual inspection along its whole length, as was the case here, by reason of the improper length and position of the holding line when plaintiff was injured. By reason of the fact that the holding or "critical" line is often connected to different places on the holding valve, when the line to the top moved, he assumed that on this unit the "critical" line was the one connected to the bottom of the holding valve or box, while in fact, it was the one on top which he disconnected.

█ Under the evidence in this record, as viewed in the light most favorable to the plaintiffs, the court properly submitted to the jury the question of defendant's negligence. This conclusion is reached upon the authority of *Fletcher v. Kemp*, 327 S.W.2d 178 (Mo.1959), where the principles governing the duty owed to the plaintiff by the defendant and the necessary showing of a breach of such duty are thus defined, l.c. 185[12, 13]:

"* * * The owner of an article or instrumentality who knows, *or by the exercise of ordinary care should know,* that it is potentially dangerous and liable to inflict injury, and who undertakes to place it in the hands of a mechanic for repair in the course of which there is a likelihood that the dangerous potential will be released, is under a duty to furnish a proper and reasonably safe article or instrumentality, and is liable to the injured party if he fails to exercise ordinary care to eliminate the dangerous condition before placing it in the hands of the mechanic, *or to notify him of the dangerous condition.* (Citations omitted). The rule covers not only articles inherently dangerous in their nature, but also articles (as in this case) *dangerous because of the use to which they are to be put by whoever may use them for the purpose intended.* (Citations omitted). * * *" (Emphasis added)

█ It is clear here that the hydraulic holding or "critical" line was of improper length in that it was too long and its excess length was placed or "stuffed" under the swivel turret and into the opening in the tower in which position it could not be identified by visual or manual inspection and which position interfered with the lines leading from the control box so that it was likely to move when other harmless lines, such as the lifting line, were shaken at the control box, which warrants the inference that this occurred immediately prior to plaintiff's injury; that the defendant knew or should have known by the exercise of ordinary care of this condition since it was possessed of specialized knowledge with reference to this type of equipment and employed skilled hydraulic mechanics and repairmen and had performed all of the inspections and shop and field maintenance on this equipment from its reconditioning to the date of the accident; that this condition constituted a danger to mechanics employed to check all hydraulic lines and replace them as needed, and that its Hydra-Lift was not equipped with a fixed boom rest but the boom could only be kept in a raised position so that this work could be done by

means of the maintenance of the pressure in the holding valve and critical line; and that the defendant failed to warn the plaintiff or his employer of this dangerous condition. The principles stated in *Fletcher* are controlling here and the authorities cited by defendant are not persuasive or authoritative to the contrary. The trial court properly submitted plaintiffs' case to the jury.

The plaintiffs' Point I presents a claim of error as relating to Instruction No. 6 given by the court below submitting the charges of contributory negligence against the plaintiff Richard W. Gilpin, and is decisive on this appeal. Point I is as follows:

"The Trial Court Erred in Giving Instruction Number 6, Which Required the Jury to Return Verdicts for Defendant If It Believed That *Plaintiff Put His Arm Underneath the Boom When Hydraulic Fluid Was Squirting Under Pressure From the Hydraulic Line Which He Had Just Disconnected* Because It Hypothesized Facts Which Were Contrary to the Evidence and Were Not Supported by Competent Substantial Evidence Thereby Allowing and Requiring the Jury to Render a Verdict Based on Speculation and Conjecture." (Emphasis supplied)

Instruction No. 6, hereinabove set forth in full, does in fact hypothesize the alleged act of contributory negligence as the third of the acts of omission and commission charged against plaintiff, all three of which are submitted therein *in the disjunctive.*

■ It is a firmly established rule that where several acts of negligence (or contributory negligence) are submitted in the disjunctive in a verdict directing instruction, *each* such hypothesis of negligence must be supported by substantial evidence. The rule applicable here as to Instruction No. 6 is thus stated in *Saupe v. Kertz,* 523 S.W.2d 826, 830[4] (Mo. banc 1975):

"Each element of a disjunctive contributory negligence instruction must be supported by substantial evidence, and the lack of such support on any one renders the submission erroneous. *Shaffer v. Kansas City Transit, Inc.,* 463 S.W.2d 606,

609[1] (Mo.App.1971); *Cook v. Cox,* 478 S.W.2d 678, 680[2] (Mo.1972). * * *"

■ In this case, therefore, the defendant had the burden of proving by substantial evidence that the plaintiff committed the affirmative negligent act of putting "his arm underneath the boom when hydraulic fluid was squirting under pressure" from the holding line which he had disconnected as was submitted in the third disjunctive hypothesis of Instruction No. 6. Stated somewhat differently but within the clear and unmistakable meaning of the instruction, the ultimate fact on this element was a finding that the plaintiff moved his arm from a place of safety outside the ambit of the lifting boom to a place under the boom in an attempt to control the squirting holding line and was thus injured.

While it is true that the defendant is not bound, in the consideration of this phase of the case, by plaintiffs' evidence unless that evidence supports its theory, *Peppes v. Huddleston,* 533 S.W.2d 701, 703[1, 2] (Mo. App.1976), in the present case there is a total lack of substantial evidence to support a finding that plaintiff committed this specific act of contributory negligence.

■ "Substantial evidence" has been broadly defined as "evidence which, if true, 'has probative force upon the issues * *'" and that type of evidence "from which the trier of fact can reasonably decide the case on the fact issues." *Zeigenbein v. Thornsberry,* 401 S.W.2d 389, 393[4] (Mo.1966). It is that type of evidence that removes it entirely from the field of conjecture or guess and places it clearly within the area of probative value. Further, a witness' testimony apparently possessed with probative value on direct examination may be shown upon cross-examination to be mere guess, speculation, impression or conjecture and thus of no probative value to establish a submissible case of negligence. *Zeigenbein v. Thornsberry,* supra, l.c. 391[3]; *Van Bibber v. Swift & Co.,* 286 Mo. 317, 228 S.W. 69, 76[9] (Banc 1921); *Cragin v. Lobbey,* 537 S.W.2d 193, 199[10] (Mo.App.1976).

The only evidence offered by the defendant to support the third disjunctive hypothesis of negligence in Instruction No. 6, was the testimony of Ira Teeter, a machine operator employed by the defendant who had brought the equipment to Moore's and was waiting in the shop for the repairs to be finished so that he could drive the equipment back into service, when the plaintiff was injured. On direct examination, he stated that just before the accident, he was standing at the back of the truck and that the plaintiff was upon the truck bed at the back of the cab on the passenger side working on the boom. The following then appears in his direct examination:

"Q. All right. Describe, if you will then, what you saw Mr. Gilpin doing.

A. Well, they were, like I say, like it's been brought out, they were checking and replacing hoses and he broke this hose.

Q. What do you mean he broke it?

A. Well, it (sic) didn't break it. Apparently it was taken loose with a wrench, which it would have to be. The way I seen it, there was oil shooting and he made a grab for it and when he did, he run his arm in there and down it came and nailed him, and that's the way it happened. * * *

*    *    *    *    *    *

Q. Were you standing in a position where you had a clear, unobstructed view of what Mr. Gilpin was doing?

A. Yes, I could, standing at the back of the truck I seen what they were doing and I seen him when he got in there.

Q. And you saw the hydraulic fluid squirting out of the hose, is that right?

A. Yes, sir.

Q. And it was after that that you say he made a reach for it?

A. Like he grabbed for it.

Q. Grabbed for the hose?

A. Which I guess would be instinct, to try to stop that flow of oil. I don't know.

*    *    *"

On cross-examination of witness Teeter, the following appears:

"Q. * * * Now, did you actually see Mr. Gilpin remove the hose?

A. I can't say I actually seen him remove it, no.

Q. So you weren't watching him then when he was loosening the connection there with the wrench?

A. *I can't recall just standing there specifically watching him.* You know, I was watching him remove these and work on these hoses in general.

Q. *I assume you weren't watching or can't tell us whether or not if while he was loosening he was holding on to that hose with his right hand?*

A. *No. I don't know.*

*    *    *    *    *    *

Q. Do you know today whether or not when he was taking that hose off he had a hold of this particular hose with his right hand?

A. *No, sir. I couldn't say."*

On recross-examination of witness Teeter, the following appears:

"Q. Mr. Teeter, I don't quite understand. You've told us you don't know whether or not he had a hold of the hose as he was taking it off and yet you tell us now he made a swipe at the hose?

A. I said I didn't know whether he had a hold of it with his right hand or not. You asked me that. He's left-handed normally, isn't it?

Q. Do you know if he had a hold of the hose with either hand as he was taking it off?

A. *I can't really say that, no.*

Q. The only other explanation would be, then, if he did have a hold of it, that he let go of it and then tried to grab it again.

A. *He may have done this. I don't know.*

Q. You just don't know, do you?

A. I know what I seen. I know there was oil shooting and the man grabbed

for the hose, *made a pass* and he was caught in it. You don't forget something like that. You see a man caught in something like that, you are not going to forget it.

Q. *Do you actually know whether or not when you saw this movement with his arm, whatever that was, whether or not at that time he had a hold of that hose or whether he was grabbing for it?*

A. *I presumed he was grabbing for it.*

Q. You presumed, but you do not know based on your observation, do you?

A. *Not exactly, no.*" (Emphasis supplied)

The plaintiff, Richard W. Gilpin, related without equivocation or qualification that the accident occurred as follows:

"Q. * * * generally describe how the accident happened. That is, what you did immediately before the boom fell.

A. I had a hold of the hose. Oil hit me in the face when I was taking the hose loose. Oil hit me in the face and I was standing there holding the hose and trying to get away from the oil hitting me in the face so I could see what was happening, and I got caught. The boom fell and I was hung there.

Q. Where was your right arm at the time this fluid started coming out?

A. Laying up on the turret a hold of the hose.

Q. Now when this hose started coming out, did you grab for any tools or anything up in there with your right hand?

A. No."

While as heretofore noted, this testimony is not binding on defendant with regard to its contributory negligence submission above discussed, it should be noted that the physical evidence—photographs, position of the critical line and whole physical structure of the equipment—clearly shows that if the plaintiff did, in fact, have a hold on the critical line with his right hand when the fluid commenced squirting, his hand and at least a portion of his right arm would be beneath the boom and in the area of real danger if the boom fell. As opposed to this, the defendant's witness, Teeter, testified on direct examination that he observed the plaintiff "grab" for the hose after the line was disconnected. Therein lies the real conflict in the evidence. However, as above set forth, Teeter on cross-examination said that he did not know and "couldn't say" if plaintiff had a hold on the hose with his right hand at that time and "presumed" that he was grabbing for it, but did not know this of his own knowledge.

■ A witness may qualify his testimony in such a way as to render it of no probative value as was said in *Zeigenbein v. Thornsberry,* supra, l.c. 391[3]:

"* * * Obviously, what she said on direct examination was shown on cross-examination to be a mere guess on her part and of no probative value, and is not sufficient to make a submissible case of negligence * * *."

In *Cragin v. Lobbey,* 537 S.W.2d 193, 199[10] (Mo.App.1976), the court confronted with a similar situation, stated:

"* * * However, if a witness cedes his prior testimony on a given issue was, in fact, predicated on a mere guess, i. e., upon speculation with no factual basis, *or if he admits to facts, conditions or circumstances which make it evident the testimony was a mere guess on his part, then his testimony does not constitute substantial evidence and has no probative value.* (Citations omitted)" (Emphasis supplied)

■ It is obvious from the record of Teeter's testimony that it falls squarely within these rules, did not constitute substantial evidence, or have probative value to establish the third disjunctive hypothesis of defendant's Instruction No. 6. The giving of this instruction was error calling for reversal of the judgment below.

Such judgment is therefore reversed and the cause remanded for a new trial.

All concur.