**George L. DRIVER, (Plaintiff) Respondent,**

**v.**

**William S. ANHEUSER, (Defendant) Appellant.**

**No. 31807.**

St. Louis Court of Appeals.

Missouri.

Oct. 19, 1965.

Rehearing Denied Nov. 17, 1965.

Application to Transfer Denied Jan. 10, 1966.

Schwartz & Ely, Robert C. Ely, St. Louis, Theodore P. Hukriede, Washington, for appellant.

Shepherd & Weenick, Charles M. M. Shepherd, Clayton, for respondent.

RUDDY, Presiding Judge.

This is an action for damages arising out of personal injuries sustained by plaintiff when the automobile he was driving was struck in the rear by an automobile driven by defendant. The trial resulted in a jury verdict in favor of plaintiff and defendant appeals.

In his answer to plaintiff's petition and at the trial defendant admitted that the collision was the result of his negligence and admitted liability.

At the time of the collision plaintiff was driving a 1959 four door Impala Chevrolet eastwardly on Highway 66 at approximately midnight on January 24, 1963. As he approached Rock Hill Road, a north and south four lane highway, there were electric signals controlling traffic on both highways. As he neared the intersection of Rock Hill Road the light on the electric signal was first yellow and then turned red for eastbound traffic on Highway 66, indicating stop. In response to the red signal, plaintiff brought his car to a full stop at the intersection. When he stopped his car was in the right hand lane next to the curb and was all the way up to the intersecting road. At the time he made his stop there were no other automobiles to his left or behind him. He had his mother-in-law in the car with him. After he had been stopped approximately 10 seconds the defendant's car ran into the rear of plaintiff's car. Plaintiff described the force of the collision as follows: "I sensed first of all that the car had been hit * * * and my body and neck taking a heavy force backwards which went backwards first, and then came back up again and back still again. I went back again, I think, because the seat had broken loose from the impact of my body, both mine and my mother-in-law's breaking the seat loose." He said his hands were pulled away from the steering wheel and his feet were pulled away from the foot pedals by the impact and the seat breaking loose from its mountings. The force of the collision propelled his car into Rock Hill Road and being concerned about the possibility of a car coming across Rock Hill Road and running into the side of his car, he said he jumped up, "grabbed the steering wheel and guided the car into a filling station on the other side of Rock Hill Road."

After the collision defendant's car was in approximately the same place as plaintiff's car had been before it was hit. In addition to tearing the front seat from its mounting, the impact of the collision tore the motor loose from its mounting and tore the battery cable, fuel pump and fuel lines loose from the motor of plaintiff's car. The frame of the car was bent and there was other extensive damage to plaintiff's automobile, all of which resulted in plaintiff's determination not to retain the car and he subsequently sold it for $325, although it had a value before the collision of $1100.

At the time of the collision plaintiff was a salesman for Hoover Bros., Inc., a school

supply and equipment company. Plaintiff had in his car a 16 MM Bell and Howell Sound Projector, a Master Viewgraph and a Hook and Loop Demonstration Board. Some of these items were damaged extensively as a result of the collision. However, because of our ultimate ruling, we need not detail the damage.

Within an hour or two after the accident plaintiff began to experience an intense throbbing headache and some backache. He took some aspirin and Alka Seltzer to get relief and got very little sleep the night of the accident. Although he was employed, as indicated, he did not pursue his occupation the following day, which was Friday, because he did not feel well and because he did not have an automobile to go to work. On the following day, which was Saturday, his condition seemed to get worse and he said he was extremely stiff and sore upon getting up in the morning. It was not until the Monday after the accident, which was January 28, 1963, that he saw Dr. Milton Kardesch for the first time concerning his injuries.

On this first visit the doctor gave plaintiff a prescription and told him to rest as much as possible and to keep hot wet towels on his neck, "as warm as I could stand it without burning." After this first visit he called the doctor on the telephone and told him he was not getting any relief from the medicine and the doctor sent out some other medicine, which he described as codeine. He described the pain he had at the time as very severe and very sharp which seemed to go up the back of his neck and gave him a terrific headache. When reclining in bed he could get no relief from the pain no matter what position he assumed. As a result he said he became irritable and nervous. He made other visits to the doctor and took the medicine and followed the doctor's instructions regularly after his first visit. At the time of the trial he said that he still had extensive pain in his neck and throbbing headaches. He said this condition did not bother him as much

if he took it easy, but if he worked the condition would get worse. He said his work involved a lot of driving, sometimes 12 to 18 hours a day and when he was not driving he did a lot of detail drawing which required him to bend over a drawing table and both the drawing work and the driving of the automobile seemed to make his condition worse. In his work he was required to call on school board meetings in the evenings but since the accident he has not been making night calls. He said he attended only one evening meeting during 1963 and there were others he should have attended but could not because he was not up to it physically. At the time of the trial he was still taking the medication prescribed by the doctor. Plaintiff lost one day of work because of his injuries and saw the doctor a total of four times prior to the trial. Approximately two to three months separated each of his visits to the doctor and he had not seen the doctor since August prior to the trial, which took place in the latter part of October 1963.

Dr. Milton Kardesch testified that he first saw plaintiff on January 28, 1963, which was the Monday following the accident, which occurred on the preceding Thursday. On this first visit Dr. Kardesch found very tender spastic neck muscles on both sides and posteriorly. However, he did find a normal range of neck motion but plaintiff appeared to be somewhat anxious. He said he could sense the extreme spasticity in plaintiff's neck by sight; that he saw plaintiff holding his head and his neck in an unnecessarily rigid position. X-ray pictures were taken from different positions and showed no fractures or dislocations and showed no encroachment or pinching possibility of any of the bones on the nerve coming out of the spinal cord. However, the X-ray pictures did show a loss of the normal curvature of the spine in the neck which Dr. Kardesch described as an abnormal condition. In describing this straightening or loss of the normal curvature of the spine at the neck he said "that the muscles

of the neck had been injured severely enough to try to compensate for the amount of pain as a result of muscle injury. The head will try to assume the position that is least painful—therefore, hold it rigid enough to try to take some of the burden off of all of the muscles." He said it was this rigid position that caused the straightening of the ordinary curve of the neckbones. His diagnosis was an acute sprain of the cervical spine and anxiety reaction.

Dr. Kardesch, in explaining what a sprain is in a muscle, said: "the sprain implies that the different muscle fibers that make up the muscle bundles have either been pulled apart or are torn. These muscle fibers are held together by a rather poor cement work of the very flimsy fibers and in between these little fibers may run vessels, blood vessels, nerves, lymphatics. During a sprain, blood vessels may tear— they are very small—nerves may be stretched; muscle fibers pulled or torn." When asked what happens to the muscle after a sprain occurs, the witness answered: "as with any tear or cut or abrasion or laceration, there is bound to be destruction and consequent scar formation as with any other tissue of the body. There would be blood vessels, muscles or skin, so, consequently, there is scar formation, however, to all variable degrees." When asked to describe the injury to the muscle, he said "A. Primarily tear, over-extension, or too much pull on the muscle, fibers being pulled apart and possibly even some minute bleeding between the spaces of the fibrils that make up the muscle." In the matter of medication he prescribed a muscle relaxant and tranquilizers and suggested the application of warm wet packs to the injured muscles. The tranquilizers were primarily for the emotional aspects.

Dr. Kardesch again saw plaintiff on March 14, June 13 and August 27, 1963. At the time of the March visit he found muscle spasm present in the same areas as before but found some improvement in the neck. On this occasion he said plaintiff complained that his neck would be-

come painful toward late in the afternoon, associated with headaches and poor visibility and poor ability to work after three to four P.M. each day. He changed the medication to include a combination muscle relaxant and tranquilizer. Prior to this March visit Dr. Kardesch had a phone call from the plaintiff on February 6, 1963, at which time plaintiff complained about no improvement in his condition and the doctor prescribed an increase in the original medication. On the occasion of the June visit the doctor found that the muscles were softer and no longer as spastic or as tender. There was much less spasm in the area but some was still present. However, plaintiff continued to complain about persistent neck pain. The last time witness examined plaintiff he found a slightly tense muscle which indicated some spasm in the area.

On direct examination Dr. Kardesch was asked if he could describe the condition and give any idea of the underlying tissue within the muscle after seeing a condition of spasm of the muscle for a period from January to August. He answered: "Generally, if spasticity and pain has gone on for this period of time, one would most likely find rather permanent areas of permanent scar tissue." He said it would be similar to scar tissue left from a cut on the arm after it healed. He was asked: "In a period of time, will this scar tissue disappear? A. No, this will remain as a permanent scar tissue." It was his opinion that the nerves emerging from the spinal canal were not injured and he believed that the area of injury was in the muscles.

The following questions were asked and answers given on direct examination concerning whether plaintiff had any permanent condition: "Q. Considering further the fact, in conjunction with the consideration you have just commented about, the fact that spasticity was present as late as August and that the patient had complained of pain and demonstrated an anxious or tense state even after the application of medications which you have men-

tioned, do you have an opinion, based upon reasonable medical certainty, as to whether or not this condition is permanent? A. Yes. Q. What is that opinion? A. I feel that Mr. Driver will have a permanent partial neck disability. Q. How will this disablity demonstrate itself in future times? A. I think over a period of time he will have a restoration of his neck function but over a period of time he will continue to have neck discomfort. Q. Based upon your experience, do you have any estimate as to the period of time that discomfort or limitation will be present? A. This would be a pure estimate because it varies so much, but I would estimate anywhere from two to four months." During the period of two to four months the plaintiff would have to continue the medicines and treatment prescribed by the doctor.

However, during cross-examination the doctor gave the following testimony concerning the question of the permanency of plaintiff's condition. "Q. Doctor, you mentioned, in response to Mr. Shepherd's questions, you said that you found, in your opinion, a permanent condition, is that right, Sir? A. No. If I did, I didn't mean to imply that. * * * I meant that the prolonged spasticity implies—over a period implies that there would be scar tissue which is a permanent—Q. The scar tissue is just as if anyone would have, say a scar on the skin of your knuckles or wherever it might be—that's there for the rest of their life, I presume? A. Yes. Q. It has no disabling feature to it whatsoever, does it? A. It's a matter of degree. Q. And in your opinion this man will have a complete recovery, will he not? A. He will have a complete restoration of his neck movements, yes."

The doctor further testified that on September 17, 1963, he made a written report to plaintiff's attorney and in his report he stated that it was then his opinion "that within one to two months that he (plaintiff) was going to be completely recovered." By complete recovery he meant that the neck would be back to where it was before the accident happened. In his report he said the prognosis "is excellent" which in his testimony he said "this implies complete recovery." He described plaintiff's condition on the first visit as moderate and during the remaining visits he found a continuing improvement in plaintiff's condition. On redirect examination the doctor said that by the term "complete recovery" he meant there would be a complete recovery of the function of the neck and neck muscles. He was asked, "will the underlying fibers return to their condition as they were previous to the time of his injury" and he answered, "No, sir. Q. So there will be no complete recovery of the tissue in question? A. That's correct."

In his first point defendant contends the trial court erred in giving Instruction No. 2 on the measure of damages when it submitted for the jury's consideration "any distinct permanent personal injuries, if any," sustained by plaintiff. In support of this contention defendant asserts that there is no evidence in the case to substantiate a finding of any permanent injury having been suffered by plaintiff. Defendant says that the only doctor in the case said that plaintiff did not have a permanent injury and that the doctor expects a complete recovery by plaintiff and for this reason the injuries suffered by plaintiff were not such as would by themselves support a finding of permanent injury. In opposition to this plaintiff contends that when all the medical evidence is considered, reasonable men must agree that the record in this case supports a submission of permanent injury, contending that in the case at bar the inquiry was as to a permanent condition and the answer of the doctor was that plaintiff would have a permanent partial neck disability, with continuing neck discomfort, including areas of permanent scar tissue that will not disappear. Because of this contention by plaintiff, we have shown

rather fully the medical testimony given by Dr. Kardesch.

■ In resolving these opposing contentions, we point out that it is a cardinal rule, firmly established, that in order for plaintiff to recover damages for permanent injury, the permanency of the injury must be shown with reasonable certainty, and while absolute certainty is not required, mere conjecture or likelihood, or even a probability, of such injury will not sustain the allowance of damages therefor. Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328; Derschow v. St. Louis Public Service Co., 339 Mo. 63, 95 S.W.2d 1173.

Addressing our remarks to that part of the testimony of Dr. Kardesch which may have a bearing on the question at issue, we find that the doctor did say that the muscles of the neck had been injured severely and that his diagnosis was an acute sprain of the cervical spine. In describing a sprain to a muscle, he said that "the sprain implies that the different muscle fibers that make up the muscle bundles have either been pulled apart or are torn * * *." Again, when asked what happens to a muscle after a sprain occurs, he said "As with any tear or cut or abrasion or laceration, there is bound to be destruction and consequently scar formation as with any other tissue of the body." The testimony which seems to have a direct bearing on plaintiff's injury is that which the doctor gave when he was asked to describe the injury to the muscle, he said, "Primarily tear, over-extension, or too much pull on the muscle, fibers being pulled apart and possibly even some minute bleeding * * *." When he was asked to describe the condition of the muscle after seeing a spasm of the muscle over a period from January to August, he answered, "Generally, if spasticity and pain has gone on for this period of time, one would most likely find rather permanent areas of scar tissue."

■ In his direct examination the doctor did say that plaintiff would have permanent partial neck disability. However, later in his direct examination he said that plaintiff would have a restoration of his neck function, but over a period of time will continue to have neck discomfort. When asked about the period of time plaintiff would have discomfort, he said it would be from two to four months. When his direct examination is considered in its entirety, it is clear that he did not give an opinion that plaintiff will have a permanent neck disability. However, this matter was clarified beyond any doubt on cross-examination, when he declared that he did not mean to imply, in his direct examination, that plaintiff would have a permanent condition and that it was his opinion plaintiff would not have a permanent disability of the neck but would have a complete restoration of his neck muscles and within several months would experience a complete recovery. In his cross-examination he did state that over a period of time plaintiff would have scar tissue which is permanent, and in this connection, on his redirect examination, he said there will be no complete recovery of the tissue in question. Therefore, a fair conclusion of the medical testimony given by Dr. Kardesch on the question of permanency would be that in his opinion plaintiff will have complete recovery, however, he would have areas of permanent scar tissue that will not disappear and which are below the surface of the skin and obviously do not disfigure and that (in the doctor's words) "there will be no complete recovery of the tissue in question."

■ In the cases and authorities, some of which we cite below, a permanent injury is defined and described as a physical or mental impairment or disability which will last throughout life. Plank v. R. J. Brown Petroleum Co., supra; Derschow v. St. Louis Public Service Co., supra; Vol. 32, Words and Phrases, Page 172. Another definition frequently used in the cases to describe permanent injuries are those in-

juries that are reasonably certain to be followed by permanent impairment of earning capacity, or producing permanent irremediable pain. Vol. 32, Words and Phrases, Page 171. In 43 C.J.S. Injury, page 1120, a permanent injury is "one that, according to every reasonable probability, will continue throughout the remainder of one's life; one that is reasonably certain to be followed by permanent impairment of earning capacity, or one which produces lasting irremediable pain; one where any physicial function, or the usefulness of a member of the body is permanently impaired."

In the instant case there is no medical evidence in the record before us which would show that plaintiff's permanent scar tissue produces or causes any physical or mental impairment or disability which will last throughout life or that the scar tissue is reasonably certain to be followed by permanent impairment of earning capacity or lasting irremediable pain; nor does the record show that the scar tissue will impair any physical function or the usefulness of any member of plaintiff's body. There is no showing that the scar tissue will be painful or sensitive or disfiguring or cause any impairment of any kind to the plaintiff. It is only when an injury, such as we have described, results from the formation of scar tissue that it becomes a proper element of recoverable damage. Scar tissue in and of itself which does not cause any of the impairments we have stated is not a proper element of damage.

In the case of State ex rel. Kansas City Public Service Co. v. Shain, 350 Mo. 316, 165 S.W.2d 428, 1. c. 431, the court said: "It is not common knowledge that fractures of bones and sacroiliac sprains are permanent injuries * * *. So we conclude that as a general rule fractures of bones and involvement of the sacroiliac joint are not injuries that may be considered permanent absent substantial evidence to that effect." Nature's healing process of a bone can be compared to that of the soft tissue of the body. In the case of a fracture of a bone it heals with calcium that unites the broken parts of the bone and frequently this healing process creates some permanent change in the contour of the bone, but this is not considered a permanent injury in and of itself as shown in the Shain case. The formation of calcium which unites the broken bone is similar to scar tissue which unites and heals the injury to the soft tissues and, therefore, it is not an injury within the meaning of the law which permits recovery of damages, unless, as we said, it causes some impairment. We rule that there is no evidence to support a finding of permanent injury. Therefore, it was reversible error for the trial court to submit the question of permanent personal injury to the jury.

In support of his contention plaintiff cites in his brief the case of Kagan v. St. Louis Public Service Co., Mo.App., 360 S.W.2d 261, a case decided by this court, wherein plaintiff suffered a cervical and lumbo-sacral sprain and an induced duodenal ulcer among other injuries. In that case defendant contended that there was no substantial evidence to support the giving of an instruction which authorized the jury to allow damages for permanent injuries. In refuting defendant's contention we pointed to the testimony of the treating doctor wherein he gave it as his opinion that plaintiff would have a permanent condition by virtue of formation of scar tissue, and with increased susceptibility of a recurrence of the duodenal ulcer. The doctor was also asked, "I will ask you to tell the Court and jury whether or not, in your opinion, he will have some permanent injury to his neck and his back as a result of this occurrence." He answered: "Oh, I think he will have some permanent effect." (360 S.W.2d 1. c. 269) Defendant contended that the use of the term "permanent effect" was less than substantial evidence of permanent injury. However, in answer to this contention we said that the use of the word "effect" instead of "injury" did not diminish the probative force of the answer that it can be said to fail to consti-

**18**

tute substantial evidence of permanency to support the giving of the instruction. There is nothing in what we said in this case that authorizes a recovery for permanent scar tissue in and of itself where it does not result in some impairment. What we did say in the Kagan case was that the plaintiff's medical testimony shows that he will have some permanent injury to his neck and his back as a result of the occurrence.

In another point relied on by defendant he contends Instruction No. 1, given at the request of plaintiff, contains error. The instruction recited the facts of the accident and then told the jury "that in allowing his automobile to collide with the rear end of the automobile of plaintiff, defendant failed to exercise the highest degree of care, because said negligence on the part of Defendant was admitted, and caused Defendant's automobile to *violently* collide with plaintiff's automobile, so now then, your verdict must be for the plaintiff." Defendant objected to the court assuming in the instruction, as an admitted fact, that he caused his automobile to *violently* collide with plaintiff's automobile. No place in the petition was defendant charged with violently colliding with plaintiff's automobile. Therefore, defendant contends there is no admission in the case as to the extent of the force of the collision. Without reciting all of the evidence showing the force of the collision, we think the evidence is sufficient from which the jury could find that the collision was violent. Inasmuch as the extent of the force of the collision becomes a very important matter for the jury to consider in determining the extent of the damages and the amount of the verdict, we think the extent of the force of the collision should be left to the jury to determine and that said instruction, in telling the jury that the collision was violent, was error. In the case of Conley v. Fuhrman, Mo., 355 S.W.2d 861, l. c. 867, the court said: "* * * an instruction should never state that a fact is

admitted unless it has been unquestionably conceded by the party or parties."

Other points asserted by the defendant concern matters that go to the question of damages. Inasmuch as this case will have to be remanded for a new trial and in a new trial the recently adopted Missouri Approved Jury Instructions will be submitted to the jury, there is no need to discuss these other points. Therefore, the judgment is reversed and the cause remanded for a new trial on the issue of damages only.

WOLFE, J., and SAMUEL E. SEMPLE, Special Judge, concur.