James W. THIENES, Plaintiff-Respondent,

v.

HARLIN FRUIT COMPANY, Defendant-Appellant.

No. 9168.

Missouri Court of Appeals, Springfield District.

Aug. 30, 1973.

William J. Marsh, Kansas City (Popham, Popham, Conway, Sweeny & Fremont, Kansas City, and Farrington, Curtis & Strong, Springfield, of counsel), for defendant-appellant.

Lee E. Wells, McKenzie, Williams, Merrick, Beamer & Wells, Kansas City, for plaintiff-respondent.

STONE, Judge.

In this jury-tried action for damages on account of personal injuries and property damage sustained by plaintiff James W. Thienes in and as the result of a vehicular collision about 1:15 A.M. on September 9, 1966, at a point on U. S. Highway 60 approximately five miles west of Mountain Grove, Missouri, plaintiff had a jury verdict of $16,500 for personal injuries and $350 for property damage, on which judgment for $16,850 was entered. Defendant Harlin Fruit Company, a Missouri corporation, appeals.

Early in the evening of September 8, 1966, plaintiff, a soldier in the United States Army who was then about one month short of his twenty-first birthday, departed from his parents' home at Richards-Gebaur Air Base near Kansas City, Missouri, where his father, a career officer in the Air Force, was stationed at the time. Driving a used 1955 Morris Minor sedan recently purchased by him, plaintiff headed for Fort Benning, Georgia, where he was to enter Officer Candidate School (hereinafter O.C.S.) on September 11. His route took him through Springfield, Missouri, and thence eastward along U. S. Highway 60 to the point of accident, where his Morris Minor was struck from the rear by a 1966 2-ton Dodge van truck owned by defendant and then being driven by its employee, Donald Ray Cox. Shortly thereafter, plaintiff was taken to a hospital at Mansfield, Missouri, from which he was transferred that same morning to Fort Leonard Wood Army Hospital where he was examined and treated for an "acromioclavicular separation" (in common football parlance, a "shoulder separation") of the left shoulder, a bruised left knee and "a scrape on [his] left side." Plaintiff later had some headaches and dizzy spells but these had ceased long prior to trial. During his stay of some six weeks at Fort Leonard Wood Army Hospital (interrupted by a convalescent leave), plaintiff twice underwent surgery to remedy his shoulder separation, initially for the insertion of a "Bosworth screw" to hold the affected bones in place and subsequently for removal of that screw after the lacerated ligaments had healed.

In November 1966, after another short convalescent leave, plaintiff was ordered to

Fort Benning where he entered O.C.S.; but the physical rigor of this training soon resulted in severe pain in his left shoulder and, after only two or three days, he reported to Martin Army Hospital at Fort Benning, where he remained for some seventeen days. Plaintiff never resumed his O.C.S. training; but, upon discharge from the hospital, he was ordered to Vietnam, where he served about one year in an aviation battalion "as an office clerk" engaged in "flight operation orientation"—work for which he had taken a five-week course in "flight operations training" prior to O.C.S. After his tour of duty in Vietnam, plaintiff was stationed in Germany for five or six months and eventually was granted an honorable discharge on November 8, 1968. The gravamen of plaintiff's case in the trial court, and likewise of his presentation on appeal, has been that, if he had not been injured, he would have successfully completed O.C.S. and been commissioned a Second Lieutenant and, by reason of subsequent "automatic" promotions to First Lieutenant and Captain, longevity and "Army-wide" increases in pay and the like, his earnings in military service from the date of accident to the time of trial (a period of more than four years and nine months) would have substantially exceeded his actual earnings during the same period, which consisted of his pay as an enlisted man (he attained the rank of E–5 while in Vietnam) and his salary in his post-military employment as manager trainee of a finance company. Further facts will be developed as required in connection with our consideration of defendant's points relied on.

Dealing initially with those points which, if here honored as presented, might require reversal and remand for retrial on all issues, we first consider defendant's contention that the learned trial judge prejudicially erred in admitting, over timely objection on the ground of hearsay, that portion of plaintiff's exhibit 13, his Army personnel record, which, under the rubric "Remarks," stated inter alia: "Relieved from Infantry OCS for physical reasons, 19 January, 67." Army Warrant Officer Jack E. Wilson produced exhibit 13, identified himself as official custodian thereof, and testified that said exhibit was plaintiff's permanent service record and that the above-quoted statement was a permanent entry therein "made by the personnel officer at the time . . . actually made at the time it occurs" and was "a required entry by the Army regulations." With the relevance of the statement not questioned, it would appear that a prima facie showing of admissibility of the entry was made within the contemplation of § 490.680, RSMo 1969, V.A.M.S., of the Uniform Business Records as Evidence Act.

However, pointing out that Warrant Officer Wilson "had no personal knowledge why plaintiff was relieved from Infantry O.C.S. or what the 'physical reasons' referred to in the record were," defendant's counsel insist that the above-quoted statement in exhibit 13 should not have been received in evidence, citing Winterton v. Van Zandt, 351 S.W.2d 696, 702–703 (Mo.1961), as authority for their supporting argument that "[w]hile the Uniform Business Record Act eliminates, in a general way, any valid objections that a recital is hearsay, the trial court should reject such recital if it appears that the person *offering the recital* is not a competent witness to testify that the recital is correct." (All emphasis herein is ours.) What the court actually said in *Winterton* was "if it appears that the person *making the report* would not have been a competent witness to testify that the recitals in the report were correct, such recitals may and should be rejected by the trial court." 351 S.W.2d at 703. In *Winterton*, it did so appear that the person *making the report* would not have been a competent witness to testify that the recitals therein were correct, but in the case at bar it does not so appear. We are of the opinion that the trial court did not err in refusing to exclude the statement here challenged. Tomlin v. Alford, 351 S.W.2d 705, 712(7, 8) (Mo.1961);

Young v. Terminal R. R. Ass'n. of St. Louis, D.C., 70 F.Supp. 106, 109–110(6); McCormick on Evidence § 312, p. 729 (2d Ed. 1972). Furthermore, admission of that statement could not fairly be said to have constituted prejudicial error for, although defendant did not concede plaintiff's inability to complete O.C.S. because of his injury, such inability was properly shown by other evidence. Boten v. Brecklein, 452 S.W.2d 86, 96(21) (Mo.1970); Kelly v. Terminal R. Ass'n. of St. Louis, 315 S.W.2d 699, 703(3) (Mo.1958). See McCallister v. Priest, 422 S.W.2d 650, 659–660(15, 16) (Mo. banc 1968).

■ Defendant also charges that the trial court erred in permitting Officer Wilson to testify concerning certain medals and citations awarded to plaintiff subsequent to his premature departure from O.C.S. because that evidence was speculative, irrelevant and prejudicial. The rationale offered in support of this assignment is that "had [plaintiff] completed O.C.S., and had he applied and been accepted for flight training thereafter, he obviously would not have been transferred to Vietnam or to an aviation battalion and as an office clerk, when and where the awards were given." Of course, whether plaintiff would have been so decorated if he had completed O.C.S. was indeed within the realm of speculation, but whether he *actually was* so decorated was susceptible of objective substantiation. "Evidence is considered relevant if the fact it tends to establish tends in turn to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue." Charles F. Curry & Co. v. Hedrick, 378 S.W.2d 522, 536(18) (Mo. 1964); State ex rel. State Dept. of Public Health & Welfare v. Luster, 456 S.W.2d 600, 604 (Mo.App.1970). Plaintiff's receipt of sundry decorations was not relevant *per se,* but the evidence pertaining to receipt of *certain* of those medals and citations might have had some relevancy insofar as they inferentially might have indicated plaintiff's acclimation to and aptitude for military service—that being the stated purpose assigned by plaintiff's counsel in response to the objection of opposing counsel. In any event, it appears that reception of the recorded evidence concerning decorations could not have constituted error "materially affecting the merits of the action" and that, therefore, the judgment for plaintiff may not be set aside on this ground. Rule 84.13(b), V.A.M.R.

However, since for another reason hereinafter discussed the case must be remanded on the issue of damages, it becomes pertinent and proper to point out that on retrial counsel should not offer, and the court should not admit, evidence concerning such medals and citations as plaintiff received by reason of the naked fact of his entry into service or the situs of a particular assignment, without regard to the quality of his performance (e. g., the National Defense Service Medal, the Vietnamese Service Medal, and others in the category of "automatic" awards), since such evidence could have no bearing upon plaintiff's acclimation to or aptitude for military service and thus could serve only to mislead the jury. In this connection, it may not be amiss to observe that, near the close of his testimony, Officer Wilson volunteered that "I missed one medal on here [apparently referring to exhibit 13, plaintiff's personnel record] . . . he's got a Bronze Star, which also is the highest award," but that we are unable to find any mention of a Bronze Star either (a) in section 24 of the "Report of . . . Discharge" (a part of exhibit 13) captioned "Decorations, Medals, Badges, Commendations, Citations and Campaign Ribbons Awarded or Authorized" or (b) elsewhere in the twelve sheets comprising exhibit 13.

■ Defendant's next complaint is that the trial court erred in refusing Instruction B which submitted the pleaded issue of plaintiff's alleged contributory negligence. This instruction directed a verdict for defendant if the jury believed that plaintiff was negligent in "suddenly slow[ing] his automobile on the highway without first

giving an adequate and timely warning of his intention to slow." It is true that negligence may be predicated upon such conduct [Tucker v. Blankenmeier, 315 S.W.2d 724, 726(2) (Mo.1958); Lafferty v. Wattle, 349 S.W.2d 519, 528–529(19) (Mo.App. 1961)—see Crawford v. McNece, 388 S.W.2d 809, 813(1) (Mo.1965)], but it is equally true that an issue submitted to a jury must be supported by substantial evidence from which the jury reasonably may find such issue [Gathright v. Pendegraft, 433 S.W.2d 299, 313(24) (Mo.1968); Brassfield v. Sears, 421 S.W.2d 321, 323(1) (Mo. 1967); Bridgeforth v. Proffitt, 490 S.W.2d 416, 425(16) (Mo.App.1973)], i. e., by evidence which, if true, has probative force upon that issue and from which the trier of the facts can reasonably resolve it. Cupples Hesse Corporation v. State Tax Commission, 329 S.W.2d 696, 702(14) (Mo. 1959); Collins v. Division of Welfare, 364 Mo. 1032, 1037, 270 S.W.2d 817, 820(6) (banc 1954); Haley v. Moore, 419 S.W.2d 512, 516–517 (Mo.App.1967).

On direct examination defendant's witness Donald Ray Cox, the driver of the Harlin truck which struck the rear end of plaintiff's Morris Minor, testified that "the car in front of me suddenly slowed," but the epistemological inquiry by *defendant's* counsel immediately thereafter, "how do you know that," disclosed that the only basis for Cox's assertion was his observation that "the distance between us, the gap between us was closing too fast." And under the probing influence of cross-examination Cox quickly conceded, "I didn't see [plaintiff's] car actually slow down, no; just that it was a difference in the gap closing so rapidly," and later confirmed his pretrial written statement given to *plaintiff's* counsel that "I did not see the car brake lights come on before the collision and I did not see the car slow before the collision, but I had the feeling the car slowed to let me go ahead and pass it, possibly."

 The submissibility of an issue depends upon proof of facts. Neither mere conclusions nor expressions of "feeling" satisfy that standard, and even the positive assertion of a witness can be so diluted and qualified by other testimony of the same witness as to render such assertion of no probative value. Zeigenbein v. Thornsberry, 401 S.W.2d 389, 393(5, 6) (Mo.1966); Madison v. Dodson, 412 S.W.2d 552, 557 (6) (Mo.App.1967); Neil v. Mayer, 426 S.W.2d 711, 716(8, 9) (Mo.App.1968). See Van Bibber v. Swift & Co., 286 Mo. 317, 337, 228 S.W. 69, 76(9) (banc 1921); Oglesby v. Missouri Pacific Ry. Co., 177 Mo. 272, 296, 76 S.W. 623, 627–628 (banc 1903); Andrews v. Raiber, 270 S.W.2d 529, 532(1) (Mo.App.1954). Cf. Brassfield v. Sears, 421 S.W.2d 321 (Mo.1967), a rear-end collision case in which Sears, the following motorist, had testified that he did not see the brake lights on Brassfield's automobile ahead of him [l. c. 323], and the court held that Sears' answer " 'I don't believe they were on, but I can't say they were not,' [was] not substantial evidence that Brassfield gave no timely and adequate signal of intention to stop or slow." [l. c. 324] The record in the case at bar reflects no submissible issue as to instant plaintiff's alleged contributory negligence and, therefore, the trial court did not err in refusing to give defendant's tendered instruction B.

This brings us to the point, carefully developed and earnestly presented by defendant, charging error "in admitting into evidence and permitting plaintiff to argue . . . evidence of the rate of promotion or advancement of Army officers, the rates of pay for various ranks of Army officers, the trend of pay for such ranks by cost of living increases, the amount of salary plaintiff might have received had plaintiff achieved various future promotions, and other evidence of the possibility of plaintiff becoming and remaining an Army officer up to the time of trial, and particularly after the end of his three-year enlistment period ending November 23, 1968, for the reason that such evidence rested in pure speculation because (1) whether plaintiff would have completed O.C.S. was speculative;

(2) even assuming plaintiff would have completed O.C.S., whether he would or could have applied and been accepted for and completed *flight training* and thereafter would have reenlisted [and] been promoted to the rank and pay of captain at the time of trial was itself pure speculation . . . ; (3) whether plaintiff would or could have remained in the service and have received promotions and raises in pay to the rank of captain at the time of trial, had he completed O.C.S. but had not either applied, qualified for or completed *flight training* was speculative . . . (6) what promotion rate or rates of pay therefor, including cost of living increases, plaintiff might have obtained was shown by the evidence to depend upon many variable factors including prospective actions by the Congress of the United States and the Departments of Defense and of the Army."

Plaintiff's testimony revealed a qualified intention to make a career of military service. His father was "a career officer" in the Air Force, and thus plaintiff had been reared in a martial milieu, which he apparently found agreeable. He had a keen interest in aviation and "was planning on making a career, to follow in [his] father's footsteps," one of the early prerequisites of which would have been *"to obtain a commission and enter flight school."* The course projected by plaintiff in furtherance of that chosen purpose was an involved one which merits close scrutiny, because the prospect of its eventuation (which is the very heart of the point under discussion) necessarily is inversely proportional to its complexity.

Preliminarily, we note plaintiff's background. He attended "three different high schools" and in June 1963 graduated with "a B average" from a high school in California. He did not attend college; but, during the eighteen-month period "immediately" following graduation from high school while with his family at an air base in Turkey, plaintiff "did attend some correspondence courses from the University of Maryland"—"it was a math and English course." After the family's return to Richards-Gebaur Air Base near Kansas City and while plaintiff was employed in a grocery store at Belton, his desire "to orient [himself] with aviation" motivated him to take a Weaver Airlines School "correspondence course for airline training," in which he "had city destinations, weight and balance, abbreviations." This apparently led to a job with Braniff Airways where his duties were (as he described them) "mainly loading . . . any type of crate, baggage, whatever . . . onto an airplane."

Having waited some two years subsequent to his graduation from high school "until I had a little more majority about me, knowing that my chances would be better of getting into O.C.S.," plaintiff enlisted in the Army on November 23, 1965, less than one month after his twentieth birthday, his enlistment record showing that he theretofore had been employed "1 month" at his "main civilian occupation" of "cargo handler airline." Following enlistment, he took basic training and a five-week course in "flight operations training," which he described as dealing with "files, records"—"coordination of records, keeping of maps, files, et cetera, on all types of aviation, operating the radio in conjunction with an aircraft," and then qualified for O.C.S. by scoring 117 on the general technology test (on which the minimum passing score was 110) and 116 on the officer candidate test (on which the minimum passing score was 115). In August 1966 plaintiff received orders directing him to report for O.C.S. on September 11; and, as we have hereinbefore noted, he was en route to Fort Benning when the collision near Mountain Grove occurred. It is at this point in our narrative of plaintiff's effort to achieve his ambition *"to obtain a commission and enter flight school"* and thereafter "follow in [his] father's footsteps" that reality ceases and hypothesis begins, for plaintiff's shoulder injury in

the collision resulted in his withdrawal from O.C.S. two or three days after entrance.

The hypothetical sequence and progression of events upon which plaintiff rests his action is essentially trinal. Initially, plaintiff postulates his completion of O.C.S. and concomitant commissioning as a Second Lieutenant in the Army. Then, plaintiff hypothesizes his application for, and acceptance into, flight school. In his final suppositive leap plaintiff theorizes winning his wings and earning promotions strictly in accordance with his hypothesized schedule. This chain of hypothesization becomes all the more frail and frangible when a meticulous search of the record reveals an evidentiary vacuum and void concerning (1) what would have been involved in, and required for, successful completion of O.C.S. and what would have been the relative difficulty of achieving such successful completion as indicated by the general attrition rate of trainees in O.C.S.,[1] (2) whether or not "a branch transfer" to the air wing would have been automatically granted to plaintiff upon completion of O.C.S. and, if not, what requirements might have been encountered in seeking such branch transfer, (3) the mental, physical and educational standards and requirements set by the Army as prerequisite to acceptance for *flight training,* and (4) what would have been involved in the nine-month course in *flight training* and what would have been the relative difficulty of successfully completing that course as evidenced by the general attrition rate of trainees.

In fact, plaintiff served his three-year term of enlistment and left the Army "because what I was after would have to be obtained through a commission in the service, which was *flight training . . .,*" i. e., *"actually piloting an airplane."* However, over repeated and continuing objections interposed on behalf of defendant, plaintiff's counsel was permitted (1) to introduce a mass of evidence as to what plaintiff would have received, including "longevity" and "Army-wide" pay increases, if he had completed O.C.S., then had been commissioned a second lieutenant, one year later had been promoted to first lieutenant, at the end of another year had been promoted to captain, and thereafter had remained in service to the time of trial almost five years after the accident in September 1966, and (2) to argue (a) that his "out-of-pocket expense" or "pecuniary loss" during the period *from the date of accident to the time of trial was $18,018.96,* which (according to counsel's computations) was the *difference between* the aggregate amount of *$36,983.50* plaintiff would have received if he had remained in service and (but for the accident) had moved upward on the hereinbefore-discussed escalator of hypothesization without interruption and in strict accordance with the projected timetable, *and* the aggregate amount of *$18,964.54* actually earned by plaintiff during the same period (which included his pay during the remainder of his three-year term of enlistment and his subsequent earnings in the management training program of Beneficial Finance Company), and (b) that plaintiff's *future loss of earnings* would be in excess of *$75,000,* a sum (so counsel assured the jury) less than the difference between the salary of a captain in military service and plaintiff's actual salary of $515 per month at the time of trial during "even half of his life expectancy," which was shown to have been 45.93 years "for a 20-year old male," plaintiff's age *at the time of his enlistment.*

■ An exhaustive review of Missouri precedents (only in small part reflected by the hereinafter-cited cases) establishes that the preeminent criterion employed to distinguish those damages recognized by and allowable under the law from those too dubious and speculative to

---

1. The only evidence bearing upon this subject was the ready agreement of plaintiff's witness Wilson on cross-examination that "a number" of those who enter O.C.S. "don't finish . . the training for one reason or another"— "many factors enter into it"—"there is no way of telling in advance, guaranteeing anybody they are going to get through O.C.S."

be compensable has been that of *"reasonable certainty."* With relatively rare exceptions this standard has been enunciated and applied not only in cases, such as that under consideration, where damages have been sought predominantly for alleged loss of earnings, past and/or future,[2] but also in a wide variety of other situations, where damages have been claimed for the alleged loss of profits,[3] for future pain and suffering,[4] for permanent injuries,[5] and in sundry other circumstances. Jenkins v. Jenkins, 453 S.W.2d 619, 621(5) (Mo.App. 1970); Moore v. St. Louis Southwestern R. Co., 301 S.W.2d 395, 402(6, 7) (Mo.App. 1957). The cases dealing with this subject are replete with reminders that the requirement of reasonable certainty contemplates and demands something more than a showing of contingent or speculative occurrences [e. g., Seymour v. House, 305 S.W.2d 1, 3–4(2, 3) (Mo.1957); Hahn v. McDowell, 349 S.W.2d 479, 482(3) (Mo. App.1961)], possible or even probable developments [e. g., Moore v. St. Louis Southwestern R. Co., supra, 301 S.W.2d at 402 (7); Brown v. Campbell, 240 Mo.App. 182, 185, 219 S.W.2d 661, 663 (1949)], or conjecture, likelihood and probability. E. g., Kiger v. Terminal R. Ass'n. of St. Louis, 311 S. W.2d 5, 14(17) (Mo.1958); Roderick v. St. Louis Southwestern R. Co., 299 S.W.2d 422, 425(2) (Mo.1957); Kramer v. May Lumber Co., 432 S.W.2d 617, 621 (Mo. App.1968); Zoeller v. Terminal R. Ass'n.

of St Louis, 407 S.W.2d 73, 78(3) (Mo.App. 1966.)[6]

■ With the foregoing in mind, our duty here is to determine whether plaintiff's evidence, viewed in the light most favorable to his case, would have permitted and supported a finding that his escalator chain of hypothesization had been established to a reasonable certainty or, otherwise stated, whether such evidence and inferences would have permitted and supported a finding that the eventuation of plaintiff's career as an Army pilot was more than a bare likelihood, possibility or probability. The question thus presented is inherently factual in nature, and the proper determination thereof cannot be facilitated to any significant extent by reference to holdings in dissimilar factual situations. This is *a fortiori* true of a case in which the reported opinion neither mentions nor refers to the established criterion of reasonable certainty, e. g., Coffman v. St. Louis-San Francisco Ry. Co., 378 S.W.2d 583 (Mo.1964) (upon which instant plaintiff primarily relies), presenting a pathetic state of facts on which an award of damages to a quadraplegic youth, sixteen years of age at the time of the accident which indisputably left him permanently and totally disabled, was affirmed. Having meticulously examined and carefully considered the evidence in the case at bar, we are unable to escape the conclusion that the

2. Seymour v. House, 305 S.W.2d 1, 3–4(2, 3) (Mo.1957); Haley v. Byers Transp. Co., 414 S.W.2d 777, 781–782(4, 5) (Mo.1967); Hodges v. Johnson, 417 S.W.2d 685, 689(3) (Mo.App.1967); Honeycutt v. Wabash R. Co., 313 S.W.2d 214, 217–218(4) (Mo.App. 1958).

3. Coonis v. Rogers, 429 S.W.2d 709, 714(5) (Mo.1968); Warner v. Southwestern Bell Telephone Co., 428 S.W.2d 596, 604(20) (Mo. 1968); Jack L. Baker Cos. v. Pasley Mfg. & Distrib. Co., 413 S.W.2d 268, 270(2) (Mo. 1967); Anderson v. Abernathy, 339 S.W.2d 817, 824(6) (Mo.1960).

4. Harrison v. Weller, 423 S.W.2d 226, 231 (12) (Mo.App.1967); Zoeller v. Terminal R. Ass'n. of St. Louis, 407 S.W.2d 73, 78(3) (Mo.App.1966); Hahn v. McDowell, 349 S.W. 2d 479, 482(2, 3) (Mo.App.1961); Pelzer v. Zeltmann, 108 S.W.2d 980, 982 (Mo.App.

1937); Rolleg v. Lofton, 230 S.W. 330, 332 (5) (Mo.App.1921).

5. Kiger v. Terminal R. Ass'n. of St. Louis, 311 S.W.2d 5, 14(17) (Mo.1958); Grimm v. Gargis, 303 S.W.2d 43, 54, 74 A.L.R.2d 599 (Mo.1957); Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328, 334(7) (1933); Driver v. Anheuser, 397 S.W.2d 11, 16(1), (Mo.App.1965); Yates v. Bradley, 396 S.W.2d 735, 738(4) (Mo.App. 1965).

6. It is a timeless truth, as wise men of bygone generations have pointed out, that "Oft expectation fails, and most oft there/ Where most it promises" [Shakespeare, All's Well That Ends Well, Act II, Sc. 1 (1564–1616)], and "The best laid plans o' mice and men/ Gang aft a-gley; An' lea'e us nought but grief and pain/ For promis'd joy." Robert Burns, To A Mouse, Stanza 7 (1785).

evidence adduced upon trial, much of which was highly speculative and should have been excluded upon defendant's objections thereto, was insufficient to have permitted and supported a finding that plaintiff's escalator chain of hypothesization had been established to a reasonable certainty, and that, therefore, the award of damages cannot stand.[7]

Having found no reversible error materially affecting the merits insofar as the issue of liability is concerned [Rule 84.13 (b)], the judgment on the issue of damages should be set aside and the cause should be remanded for a new trial on that issue only. Rule 84.14; Bridgeforth v. Proffitt, supra, 490 S.W.2d at 426(21), and cases there cited. It is so ordered.

TITUS, C. J., and HOGAN, J., concur.

BILLINGS, J., not participating.

7. In fairness to the capable and conscientious trial judge, it should be noted that defendant's full and repeated objections were overruled and counsel for instant plaintiff was permitted to present his evidence and argument on the issue of damages, after being forewarned by the court at one point that "we are in a gray area" and subsequently by the pointed and unmistakable caveat that "plaintiff is accepting the risk that all of this is in the area of speculation, but I am letting you try your case the way you prepared it."